Edward M. GILBERT, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 607, Docket 76–4170.

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1977.

Decided April 4, 1977.

Robert D. Whoriskey, New York City (Curtis, Mallet-Prevost, Colt & Mosle, Peter E. Fleming, Jr., John E. Sprizzo and James M. Boyd, New York City, on the brief), for appellant.

Jonathan S. Cohen, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and F. Arnold Heller, Attys., Tax Div., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before LUMBARD and FEINBERG, Circuit Judges, and COFFRIN, District Judge.*

LUMBARD, Circuit Judge:

■ The taxpayer Edward M. Gilbert appeals from a determination by the tax court that he realized taxable income on certain unauthorized withdrawals of corporate funds made by him in 1962. We reverse.

Until June 12, 1962, Gilbert was president, principal stockholder, and a director of the E. L. Bruce Company, Inc., a New York corporation which was engaged in the lumber supply business. In 1961 and early 1962 Gilbert acquired on margin substantial personal and beneficial ownership of stock in another lumber supply company, the Celotex Corporation, intending ultimately to bring about a merger of Celotex into Bruce. To this end, he persuaded associates of his to purchase Celotex stock, guaranteeing them against loss, and also induced Bruce itself to purchase a substantial number of Celotex shares. In addition, on March 5, 1962, Gilbert granted Bruce an option to purchase his Celotex shares from him at cost. By the end of May 1962, 56% of Celotex was thus controlled by Gilbert and Bruce, and negotiations for the merger were proceeding; agreement had been reached that three of the directors of Bruce would be placed on the board of Celotex. It is undisputed that this merger would have been in Bruce's interest.[1]

The stock market declined on May 28, 1962, however, and Gilbert was called upon to furnish additional margin for the Celotex shares purchased by him and his associates.

Lacking sufficient cash of his own to meet this margin call, Gilbert instructed the secretary of Bruce to use corporate funds to supply the necessary margin. Between May 28 and June 6 a series of checks totalling $1,958,000 were withdrawn from Bruce's accounts and used to meet the margin call. $5,000 was repayed to Bruce on June 5. According to his testimony in the tax court, Gilbert from the outset intended to repay all the money and at all times thought he was acting in the corporation's best interests as well as his own.[2] He promptly informed several other Bruce officers and directors of the withdrawals; however, some were not notified until June 11 or 12.

On about June 1, Gilbert returned to New York from Nevada, where he had been attending to a personal matter. Shortly thereafter he consulted with Shearman, Sterling & Wright, who were outside counsel to Bruce at the time, regarding the withdrawals. They, he, and another Bruce director initiated negotiations to sell many of the Celotex shares to Ruberoid Company as a way of recouping most of Bruce's outlay.

On June 8, Gilbert went to the law offices of Shearman, Sterling & Wright and executed interest-bearing promissory notes to Bruce for $1,953,000 secured by an assignment of most of his property.[3] The notes were callable by Bruce on demand, with presentment and notice of demand waived by Gilbert. The tax court found that up through June 12 the net value of the assets assigned for security by Gilbert substantially exceeded the amount owed.[4]

---

* Honorable Albert W. Coffrin of the United States District Court for the District of Vermont, sitting by designation.

1. According to undisputed testimony in the tax court, it was the consensus of the Bruce board that the Celotex assets were selling at a bargain price and also that the dovetailing of the two companies' sales operations would result in substantial economies.

2. Two years previously, Gilbert accomplished a merger with Bruce of another corporation controlled by him, Empire National Corporation, and in the process he had made some unau-

thorized withdrawals of Empire funds, all of which he paid back.

3. In the tax court, Gilbert testified: "All I wanted to do was pay back what I owed, and I signed whatever was put in front of me and said that's what I was using it for, to pay back what I owed."

4. The assigned property included Gilbert's holdings in Bruce and Equimark, other investment interests, paintings with insured value of $476,750, a stamp collection and some real estate. Gilbert's Bruce stock was already partial-

After Gilbert informed other members of the Bruce board of directors of his actions, a meeting of the board was scheduled for the morning of June 12. At the meeting the board accepted the note and assignment but refused to ratify Gilbert's unauthorized withdrawals. During the meeting, word came that the board of directors of the Ruberoid Company had rejected the price offered for sale of the Celotex stock. Thereupon, the Bruce board demanded and received Gilbert's resignation and decided to issue a public announcement the next day regarding his unauthorized withdrawals. All further attempts on June 12 to arrange a sale of the Celotex stock fell through and in the evening Gilbert flew to Brazil, where he stayed for several months. On June 13 the market price of Bruce and Celotex stock plummeted, and trading in those shares was suspended by the Securities and Exchanges Commission.

On June 22 the Internal Revenue Service filed tax liens against Gilbert based on a jeopardy assessment for $3,340,000, of which $1,620,000 was for 1958–1960 and $1,720,000 was for 1962.[5] Bruce, having failed to file the assignment from Gilbert because of the real estate filing fee involved,[6] now found itself subordinate in priority to the IRS and, impeded by the tax lien, has never since been able to recover much of its $1,953,000 from the assigned assets.[7] For the fiscal year ending June 30, 1962, Bruce claimed a loss deduction on the $1,953,000 withdrawn by Gilbert. Several years later Gilbert pled guilty to federal and state charges of having unlawfully withdrawn the funds from Bruce.

On these facts, the tax court determined that Gilbert realized income when he made the unauthorized withdrawals of funds from Bruce, and that his efforts at restitution did not entitle him to any offset against this income.

The starting point for analysis of this case is *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), which established that embezzled funds can constitute taxable income to the embezzler.

When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to the money, and even though he may still be adjudged liable to restore its equivalent."

Id. at 219, 81 S.Ct. at 1055.

The Commissioner contends that there can never be "consensual recognition . . . of an obligation to repay" in an embezzlement case. He reasons that because the corporation—as represented by a majority of the board of directors—was unaware of the withdrawals, there cannot have been *consensual* recognition of the obligation to repay at the time the taxpayer Gilbert acquired the funds. Since the withdrawals were not authorized and the directors refused to treat them as a loan to Gilbert, the Commissioner concludes that Gilbert should be taxed like a thief rather than a borrower.

■ In a typical embezzlement, the embezzler intends at the outset to abscond

---

ly mortgaged to the First National Bank of Chicago for a $2,115,000 loan.

5. Gilbert was ultimately found liable for only $100,000 on the 1958–1960 assessments; his liability on the 1962 assessment is the subject of this lawsuit.

6. When attempting to file in the New York County Clerk's office on June 13 or 14, Bruce was told that it would have to pay a mortgage tax of at least $10,000 because the assignment included real property. Since the net value of the real property was negligible, Bruce sought

to perfect only the personal property portion, but the clerk still demanded the mortgage tax on the ground that the real property assignment and the personal property assignment were contained in the same document.

7. As of the date of trial in the tax court, less than $500,000 had been raised through sales of the assigned assets. Pursuant to an agreement reached between Bruce and the government in 1970, 35% of these proceeds have been paid over to the government pending the outcome of this lawsuit.

with the funds. If he repays the money during the same taxable year, he will not be taxed. See *James v. Commissioner*, supra at 220, 81 S.Ct. 1052; *Quinn v. Commissioner*, 524 F.2d 617, 624–25 (7th Cir. 1975); Rev.Rul. 65–254, 1965—2 Cum.Bul. 50. As we held in *Buff v. Commissioner*, 496 F.2d 847 (2d Cir. 1974), if he spends the loot instead of repaying, he cannot avoid tax on his embezzlement income simply by signing promissory notes later in the same year. See also id. at 849–50 (Oakes, J., concurring).

This is not a typical embezzlement case, however, and we do not interpret *James* as requiring income realization in every case of unlawful withdrawals by a taxpayer. There are a number of facts that differentiate this case from *Buff* and *James*. When Gilbert withdrew the corporate funds, he recognized his obligation to repay and intended to do so.[8] The funds were to be used not only for his benefit but also for the benefit of the corporation; meeting the margin calls was necessary to maintain the possibility of the highly favorable merger. Although Gilbert undoubtedly realized that he lacked the necessary authorization, he thought he was serving the best interests of the corporation and he expected his decision to be ratified shortly thereafter. That Gilbert at no time intended to retain the corporation's funds is clear from his actions.[9] He immediately informed several of the corporation's officers and directors, and he made a complete accounting to all of them within two weeks. He also disclosed his actions to the corporation's outside counsel, a reputable law firm, and followed its instructions regarding repayment. In signing immediately payable promissory notes secured by most of his assets, Gilbert's clear intent was to ensure that Bruce would obtain full restitution. In addition, he attempted to sell his shares of Celotex stock

in order to raise cash to pay Bruce back immediately.

■ When Gilbert executed the assignment to Bruce of his assets on June 8 and when this assignment for security was accepted by the Bruce board on June 12, the net market value of these assets was substantially more than the amount owed. The Bruce board did not release Gilbert from his underlying obligation to repay, but the assignment was nonetheless valid and Bruce's failure to make an appropriate filing to protect itself against the claims of third parties, such as the IRS, did not relieve Gilbert of the binding effect of the assignment. Since the assignment secured an immediate payable note, Gilbert had as of June 12 granted Bruce full discretion to liquidate any of his assets in order to recoup on the $1,953,000 withdrawal. Thus, Gilbert's net accretion in real wealth on the overall transaction was zero: he had for his own use withdrawn $1,953,000 in corporate funds but he had now granted the corporation control over at least $1,953,000 worth of his assets.

We conclude that where a taxpayer withdraws funds from a corporation which he fully intends to repay and which he expects with reasonable certainty he will be able to repay, where he believes that his withdrawals will be approved by the corporation, and where he makes a prompt assignment of assets sufficient to secure the amount owed, he does not realize income on the withdrawals under the *James* test. When Gilbert acquired the money, there was an express consensual recognition of his obligation to repay: the secretary of the corporation, who signed the checks, the officers and directors to whom Gilbert gave contemporaneous notification, and Gilbert himself were all aware that the transaction was in the nature of a loan. Moreover, the funds were certainly not received by Gilbert "without restriction as to their disposition" as is re-

---

8.  *Quinn v. Commissioner*, supra at 619, 623–25, relied on by the Commissioner, involved taxation of funds received without any contemporaneous recognition of the obligation to repay, and it is therefore distinguishable from the present case.

9.  If Gilbert had been intending to abscond with the $1,953,000, it is difficult to see how he could have hoped to avoid detection in the long run. Since his equity in the corporation itself was worth well over $1,953,000, it would have been absurd for him to attempt such a theft.

quired for taxability under *James*; the money was to be used solely for the temporary purpose of meeting certain margin calls and it was so used. For these reasons, we reverse the decision of the tax court.