**Mark D. COLLINS, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

**No. 1136, Docket 92–4216.**

United States Court of Appeals, Second Circuit.

Argued March 10, 1993.

Decided Aug. 30, 1993.

James B. Lewis, Director, Student Tax Clinic, Benjamin N. Cardozo School of Law, Yeshiva University, New York City, for petitioner-appellant.

Linda E. Mosakowski, Washington, DC (James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen, Gilbert S. Rothenberg, Tax Div., Dept. of Justice, Washington, DC, of counsel), for respondent-appellee.

---

Before: CARDAMONE and MAHONEY, Circuit Judges, and KEENAN, District Judge.*

CARDAMONE, Circuit Judge:

Mark D. Collins, taxpayer or appellant, appeals from a final decision of the United States Tax Court (Beghe, J.), entered October 16, 1992, determining that, as a result of unreported gross income from theft, he had an income tax deficiency for 1988 of $9,359. The theft occurred when the taxpayer, an employee of a betting parlor that accepts bets on horse races, was unable to stop himself from making wagers on his own behalf. He punched his bets on his computer without funds to pay for them. The horses Collins bet on ran like those of the bettor immortalized in Stephen C. Foster's *De Camptown Races* (Robbins Music Corp. 1933) (Song), some of whose horses left the racetrack, others cut across it, and one got stuck "in a big mud hole." Appellant's horses finished out of the money on most of the races he bet on and he lost heavily for the day. That which Collins had stolen is what he most feared to keep, as is so often the case; so he turned himself in. The theft precipitated a chain of events that led to the present appeal.

## BACKGROUND

### A. Theft and Racetrack Betting

Collins was employed as a ticket vendor and computer operator at an Off–Track Betting (OTB) parlor in Auburn, New York. OTB runs a network of 298 betting parlors in New York State that permit patrons to place legal wagers on horse races without actually going to the track. Operating as a cash business, OTB does not extend credit to those making bets at its parlors. It also has a strict policy against employee betting on horse races. Collins, an apparently compulsive gambler, ignored these regulations and occasionally placed bets on his own behalf in his computer without paying for them. Until July 17, 1988 he had always managed to

---

* Hon. John F. Keenan, United States District Court Judge for the Southern District of New York, sitting by designation.

cover those bets without detection. On that date, appellant decided he "would like some money" and on credit punched up for himself a total of $80,280 in betting tickets.

Collins began the day by betting $20 on a horse across the board in the first race at the Finger Lakes Race Track in upstate New York, that is, he bet $20 to win, $20 to place (finish second or better), and $20 to show (finish third or better). The horse finished out of the money (not in the top three racers) and Collins lost $60. On the second race Collins again bet $40 across the board, with the same results. He was now out a total of $180. Appellant repeated this pattern, betting $600 in the third race and $1,500 in the fourth race at Finger Lakes, both of which he lost. Collins did not bet on the fifth race, but he wagered $1,500 in the sixth race, $7,500 in the seventh, and $15,000 in the eighth. Collins' luck continued to hold steady: he lost all of these races and now owed OTB $26,280.

There were only two races left that day and Collins was determined to recoup his losses. Consequently, he gambled $25,500 of OTB's money on the ninth race. This time his horse came in third, and Collins won back $8,925. He then bet $28,500 in the last or tenth race and finally picked a winner. The winning horse paid him $33,250. After this race, Collins was behind $38,105 for the day.

At the close of the races Collins put his $42,175 in winning tickets in his OTB drawer and reported his bets and his losing ticket shortfall to his supervisor, who until then had not been aware of Collins' gambling activities. She called the police, and in police custody Collins signed an affidavit admitting what he had done. On October 27, 1988 he pled guilty to one count of grand larceny in the third degree, a felony under New York law. *See* N.Y.Penal Law § 155.35 (McKinney 1988). Collins was sentenced on December 1, 1988 by the Cayuga County Court in Auburn, New York, to five years of probation, 150 hours of community service, and a $100 surcharge.

Appellant's bets not only resulted in a shortfall in his till at OTB, but also had an impact on the odds of the races on which he had made those wagers. Racetrack gambling in New York is run on a "pari-mutuel" system. Under that system all bets—on each type of wager for each race—are pooled into a single so-called mutuel fund. The odds and payoffs for the first three horses in a race depend on the total amount of money in this pool. By increasing the total sum of money in the pool, Collins' bets lowered the odds and potential payoffs on those horses on which he bet, and correspondingly increased the odds and potential payoffs on the other horses in the same race. Because Collins lost his first seven bets on July 17, his wagers increased the payout for the winners of each of those races. By contrast, Collins' last two winning bets reduced the funds available to pay off legitimate bettors who had paid cash for their winning tickets. In addition, appellant's bets increased OTB's liability to the Finger Lakes Track. Each of his bets was electronically transmitted to the racetrack via computer, and once so forwarded, OTB became liable to transfer the amount of the wager to the track.

These unauthorized actions on Collins' part resulted in OTB making a claim under its theft insurance policy with the Hartford Accident & Indemnity Co. The insurer, which paid the claim less a $5,000 deductible, sued Collins for the amount it had paid over plus costs. In December 1989 Hartford obtained a judgment against Collins for $36,601.94, and it has subsequently made attempts to enforce this judgment by garnishing Collins' wages from his new employer. The record does not reveal whether the insurer has recovered any of its money.

### B. Tax Deficiency

Collins filed a timely federal income tax return for 1988 in which he reported wages of $11,980 and a corresponding tax liability of $1,054. He did not believe that his illegal activities on July 17, 1988 had any tax consequences, but the Internal Revenue Service (IRS) disagreed. On March 1, 1990 it mailed the taxpayer a deficiency notice resulting from his failure to report $38,136 in "gross income from gambling winnings during the taxable year 1988." It determined that due to this unreported income, Collins owed $9,376 in additional taxes for the calendar

year 1988. Pursuant to 26 U.S.C. §§ 6653 and 6661, the IRS also charged Collins with penalties of $2,344 for substantial understatement of income tax and $469 for intentionally disregarding IRS rules and regulations.

The taxpayer objected to these assessments and, on June 4, 1990, filed a petition for relief with the United States Tax Court. The IRS replied to the petition by asserting, as an alternative theory of tax liability, that Collins received his $38,136 in "gross income from theft and embezzlement." The tax court, per Judge Beghe, held a one-day bench trial on November 19, 1991 and handed down an opinion on August 24, 1992 in which it found Collins liable for the unreported income, but not for any of the additional penalties.

It first determined that Collins' actions, rather than giving rise to gambling income, had resulted in a $38,105 gambling loss, arrived at by subtracting all the amounts he had earlier lost from his winnings on the last two races. Thus, contrary to the IRS' position, the taxpayer had not received any net income from his betting activities on July 17, 1988. The tax court then turned to what it deemed the more difficult question: whether the $80,280 in unpaid bets placed by Collins constituted theft or embezzlement income. It answered this query in the affirmative after undertaking a two-step inquiry that examined: (1) whether Collins realized economic value from the betting tickets he stole (the Realizable Value Test) and, if so, (2) whether Collins had sufficient control over this stolen property to derive value from it (the Control Test). The tax court found that Collins' larceny met both parts of the test because he had the opportunity to derive gratification and economic gain from using the stolen tickets.

Having concluded that Collins' theft resulted in income, the tax court calculated the amount of that income. It found a proper measure was the $80,280 value of the tickets, because Collins received from the pilfered tickets the same benefit that any legitimate purchaser would have gotten. To calculate tax liability the court then deducted from the $80,280 the $42,175 in winnings that Collins returned to his OTB till, which it characterized as a restitution payment by the taxpayer to his employer.

In sum, the tax court found Collins' unreported taxable income to be that amount which he stole on July 17 but did not return to his OTB till, a total that came to $38,105. As a consequence, it entered a final judgment on October 16, 1992 holding Collins liable for $9,359 in unpaid taxes for 1988. No additional penalties were assessed. The taxpayer has appealed contending, first, that the tax court erred by treating his illicit July 17 activities as giving rise to gross income and, second, by measuring this income by the face value of the tickets he misappropriated. We affirm.

## DISCUSSION

### I   Gross Income

#### A.   General Principles

In addressing the argument Collins raises regarding the tax treatment of his illegal actions, we believe it useful to set out initially the basic principles underlying the definition of gross income. Internal Revenue Code § 61 defines gross income broadly as "all income from whatever source derived." 26 U.S.C. § 61 (1988). It then categorizes 15 common items that constitute gross income, a list that includes interest, rents, royalties, salaries, annuities, and dividends, among others. Gross income, as § 61 specifically states, is "not limited to" the enumerated items.

Defining gross income as "all income" is admittedly somewhat tautological. In the early days of the tax code, the Supreme Court recognized this problem and attempted to provide a more workable and perhaps somewhat more limited definition for the term. It defined income in *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920), " 'as gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets...." *Id.* at 207, 40 S.Ct. at 193 (quoting *Doyle v. Mitchell Bros. Co.*, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054 (1918)).

It soon became evident that this definition created more problems than it solved. Under the *Eisner* formulation questions arose as to whether gains from cancellation of indebtedness or embezzlement—which do not fall neatly into either the labor or capital categories—constituted gross income. *See* Stanley S. Surrey & William C. Warren, *The Income Tax Project of the American Law Institute: Gross Income, Deductions, Accounting, Gains and Losses, Cancellation of Indebtedness*, 66 Harv.L.Rev. 761, 770–71 (1953). Acknowledging the defects in the *Eisner* definition, the Supreme Court began to steer away from it. For example, in *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3, 52 S.Ct. 4, 4, 76 L.Ed. 131 (1931), it held that gains from the retirement of corporate bonds by their issuer at less than their issuing price were includable in gross income. Justice Holmes, writing for the Court, reached this conclusion despite the fact that the gains were not clearly derived from either capital or labor. In so doing he adverted to the futility of attempting to capture the concept of income and encapsulate it within a phrase. *See id.*

The Court finally abandoned the stilted capital-labor formulation of gross income and jettisoned its earlier attempts to define the term in *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430–31, 75 S.Ct. 473, 476–77, 99 L.Ed. 483 (1954). There the taxpayers had received treble damage awards from successfully prosecuting antitrust suits. They argued that two-thirds of these awards constituted punishment imposed on the wrongdoer and, under the gross income definition of *Eisner*, this punitive portion of the damages could not be treated as income derived from either labor or capital. *See id.* 348 U.S. at 428–30, 75 S.Ct. at 475–76. In rebuffing this proposition, the Court ruled the damage awards taxable in their entirety. It cast aside *Eisner*'s definition of income stating that it was "not meant to provide a touchstone to all future gross income questions." *Id.* 348 U.S. at 431, 75 S.Ct. at 477. Instead the Court stated, "Congress applied no limitations as to the source of taxable receipts, nor restrictive labels as to their nature." *Id.* at 429–30, 75 S.Ct. at 476. The legislature intended to simply tax "all gains," which the

Court effectively described as all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Id.* at 430–31, 75 S.Ct. at 477.

Since *Glenshaw Glass* the term gross income has been read expansively to include all realized gains and forms of enrichment, that is, "all gains except those specifically exempted." *Id.* at 430, 75 S.Ct. at 476; *see also Commissioner v. Kowalski*, 434 U.S. 77, 82–83, 98 S.Ct. 315, 318–19, 54 L.Ed.2d 252 (1977); Surrey & Warren, *supra*, at 771. Under this broad definition, gross income does not include all moneys a taxpayer receives. It is quite plain, for instance, that gross income does not include money acquired from borrowings. Loans do not result in realized gains or enrichment because any increase in net worth from proceeds of a loan is offset by a corresponding obligation to repay it.

This well-established principle on borrowing initially gave rise to another nettlesome question on how embezzled funds were to be treated. The Supreme Court once believed that money illegally procured from another was not gross income for tax purposes when the acquiror was legally obligated, like a legitimate borrower, to return the funds. *See Commissioner v. Wilcox*, 327 U.S. 404, 408–09, 66 S.Ct. 546, 549, 90 L.Ed. 752 (1946). In *Rutkin v. United States*, 343 U.S. 130, 136–38, 72 S.Ct. 571, 575–76, 96 L.Ed. 833 (1952), the Court partially and somewhat unsatisfactorily abandoned that view, holding that an extortionist, unlike an embezzler, was obligated to pay tax on his ill-gotten gains because he was unlikely to be asked to repay the money.

*Rutkin* left the law on embezzlement in a murky state. This condition cleared in *James v. United States*, 366 U.S. 213, 218, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961). There the Court stated unequivocally that all unlawful gains are taxable. It reasoned that embezzlers, along with others who procure money illegally, should not be able to escape taxes while honest citizens pay taxes on "every conceivable type of income." *Id.* at 221, 81 S.Ct. at 1056. Thus, under *James*, a taxpayer has received income when she "ac-

quires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition...." *Id.* at 219, 81 S.Ct. at 1055. This income test includes all forms of enrichment, legal or otherwise, but explicitly excludes loans.

■ Distinguishing loans from unlawful taxable gains has not usually proved difficult. Loans are identified by the mutual understanding between the borrower and lender of the obligation to repay and a *bona fide* intent on the borrower's part to repay the acquired funds. Accordingly, in *Buff v. Commissioner,* 496 F.2d 847, 849 (2d Cir.1974), we found an embezzler who confessed to his crime and within the same year signed a judgment agreeing to make repayment had received a taxable gain as opposed to a loan because he never had any intention of repaying the money. The embezzler's expressed consent to repay the loan, we determined, "was not worth the paper it was written on." *Id.* The mere act of signing such a consent could not be used to escape tax liability.

■ It is important to note, in addition, that though an embezzler must under the *James* test include as taxable income all amounts illegally acquired, the taxpayer may ordinarily claim a tax deduction for payments she makes in restitution. Such a deduction is available for the tax year in which the repayments are made. *See* 26 U.S.C. § 165(c); *James,* 366 U.S. at 220, 81 S.Ct. at 1056; *Stephens v. Commissioner,* 905 F.2d 667, 671 (2d Cir.1990); *Quinn v. Commissioner,* 524 F.2d 617, 623–24 (7th Cir.1975).

### B. Principles Applied

■ With this outline of the relevant legal principles in mind, we have little difficulty in holding that Collins' illegal activities gave rise to gross income. Under the expansive definitions of income advanced in *Glenshaw Glass* and *James,* larceny of any kind resulting in an unrestricted gain of moneys to a wrongdoer is a taxable event. Taxes may be assessed in the year in which the taxpayer realizes an economic benefit from his actions. In this case, Collins admitted to stealing racing tickets from OTB on July 17, 1988. This larceny resulted in the taxpayer's

enrichment: he had the pleasure of betting on horses running at the Finger Lakes Race Track. Individuals purchase racing tickets from OTB because these tickets give them the pleasure of attempting to make money simply by correctly predicting the outcomes of horse races. By punching up tickets on his computer without paying for them, Collins appropriated for himself the same benefit that patrons of OTB pay money to receive. This illegally-appropriated benefit, as the tax court correctly concluded, constituted gross income to Collins in 1988.

The taxpayer raises a series of objections to this conclusion. He first insists that such a holding cannot be correct because at the end of the day he was in debt by $38,105. He asserts that a tax is being assessed on his losses rather than on any possible gain. What may seem at first glance a rather anomalous result is explained by distinguishing between Collins' theft and his gambling activities. Collins took illegally acquired assets and spent them unwisely by betting on losing horses at a racetrack.

Although the bets gave rise to gambling losses, the taxpayer gained from the misappropriation of his employer's property without its knowledge or permission. The gambling loss is not relevant to and does not offset Collins' gain in the form of opportunities to gamble that he obtained by virtue of his embezzlement. Collins' situation is quite the same as that of any other individual who embezzles money from his employer and subsequently loses it at the racetrack. Such person would properly have his illegally-acquired assets included in his gross income. Further, taxpayer would not be able to deduct gambling losses from theft income because the Internal Revenue Code only allows gambling losses to offset gambling winnings. *See* 26 U.S.C. § 165(d). Collins is being treated the same way.

■ The taxpayer next contends his larceny resulted in no taxable gain because he recognized that he had an obligation to repay his employer for the stolen tickets. He posits that recognition of a repayment obligation transformed a wrongful appropriation into a nontaxable transaction. In effect, Collins

tries to revive pre-*James* law under which an embezzler's gain could be found nontaxable due to the embezzler's duty to repay stolen funds. Yet, the Supreme Court has clearly abandoned the pre-*James* view and ruled instead that only a loan, with its attendant *"consensual recognition"* of the obligation to repay, is not taxable. *See James,* 366 U.S. at 219, 81 S.Ct. at 1055 (emphasis added). There was no loan of funds, nor was there any "consensual recognition" here: OTB never gave Collins permission to use betting tickets. To the contrary, it has strict rules against employee betting, and Collins could not have reasonably believed that his supervisors would have approved of his transactions. His unilateral intention to pay for the stolen property did not transform a theft into a loan within the meaning of *James.* *Cf. United States v. Rosenthal,* 454 F.2d 1252, 1254 (2d Cir.) (Friendly, J.) (finding no "consensual recognition" under *James* although taxpayer "had daily recited a litany of intention to pay"), *cert. denied,* 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 134 (1972).

■ The taxpayer then avers this case is analogous to *Gilbert v. Commissioner,* 552 F.2d 478 (2d Cir.1977), in which we found a consensual recognition of the obligation to repay despite the absence of a loan agreement. Taxpayer Edward Gilbert, as president and a director of E.L. Bruce Company, acquired on margin a substantial personal stake in the stock of a rival company, Celotex Corporation, intending to bring about a merger between Celotex and E.L. Bruce. The stock market declined after Gilbert bought these shares, and he was required to meet several margin calls. Lacking personal funds to meet these obligations, Gilbert instructed the corporate secretary of E.L. Bruce to make $1.9 million in margin payments on his behalf. A few days later, Gilbert signed secured promissory notes to repay the funds; but, the corporation's board of directors refused to ratify Gilbert's unauthorized withdrawal, demanded his resignation, and called in his notes. The board also declined to merge with Celotex, and soon thereafter the Celotex stock that Gilbert owned became essentially worthless. Gilbert could not repay his obligations to E.L. Bruce, and he eventually pled guilty to federal and state charges of unlawfully withdrawing funds from the corporation. *See id.* at 479–81.

The IRS claimed that Gilbert's unauthorized withdrawal of funds constituted income to the taxpayer. It asserted that there was no consensual recognition of a repayment obligation because E.L. Bruce Company's board of directors was unaware of and subsequently disapproved Gilbert's actions. Citing the highly atypical nature of the case, we held that Gilbert did not realize income under the *James* test because (1) he not only "fully" intended but also expected "with reasonable certainty" to repay the sums taken, (2) he believed his withdrawals would be approved by the corporate board, and (3) he made prompt assignment of assets sufficient to secure the amount he owed. *Id.* at 481. These facts evidenced consensual recognition and distinguished *Gilbert* from the more typical embezzlement case where the embezzler plans right from the beginning to abscond with the embezzled funds. *See id.* at 480–81.

Plainly, none of the significant facts of *Gilbert* are present in the case at hand. Collins, unlike Gilbert, never expected to be able to repay the stolen funds. He was in no position to do so. The amount he owed OTB was three times his annual salary—a far cry from *Gilbert,* where the taxpayer assigned to the corporation enough assets to cover his unauthorized withdrawals. Also in contrast to Gilbert, Collins could not have believed that his employer would subsequently ratify his transactions. He knew that OTB had strict rules against employee betting. Moreover, while Gilbert was motivated by a desire to assist his corporation, Collins embezzled betting tickets because he wanted to make some money. Collins' purpose makes this a garden variety type of embezzlement case, not to be confused with a loan. *Gilbert* is therefore an inapposite precedent.

■ Finally, appellant complains of the root unfairness and harshness of the result, declaring that the imposition of a tax on his July 17 transaction is an attempt to use the income tax law to punish misconduct that has already been appropriately punished under the criminal law. Although we are not with-

out some sympathy to the taxpayer's plight, we are unable to adopt his claim of unfairness and use it as a basis to negate the imposition of a tax on his income. The Supreme Court has repeatedly emphasized that taxing an embezzler on his illicit gains accords with the fair administration of the tax law because it removes the anomaly of having the income of an honest individual taxed while the similar gains of a criminal are not. *See James,* 366 U.S. at 218, 81 S.Ct. at 1054–55; *Rutkin,* 343 U.S. at 137–38, 72 S.Ct. at 575–76. Thus, there is no double penalty in having a taxpayer prosecuted for the crime that resulted in his obtaining ill-gotten gains and subsequently being required to pay taxes on those illegal gains. Such is not an unduly harsh result because Internal Revenue Code § 165 provides that once the taxpayer makes restitution payments to OTB or its insurer, he will be able in that year to deduct the amount of those payments from his gross income. *See* 26 U.S.C. § 165(c).

In sum, we hold that under the expansive definition of income adopted in *Glenshaw Glass* and *James,* Collins received gross income from his theft of OTB betting tickets. There is no basis upon which we may hold that the receipt of these opportunities to gamble may be excluded from a calculation of the taxpayer's income. When and if Collins repays the stolen funds, he will be entitled to a deduction from income in the year that the funds are repaid.

## II Valuation

■ Having determined that the July 17 transaction resulted in a taxable gain to Collins, we next consider how that gain should be measured. It is well-settled that income received in a form other than cash is taxed at its fair market value at the time of its receipt. *See, e.g., Joslin v. United States,* 666 F.2d 1306, 1307 (10th Cir.1981) (per curiam); *Wills v. Commissioner,* 411 F.2d 537, 543 (9th Cir.1969); *Musselman Hub–Brake Co. v. Commissioner,* 139 F.2d 65, 68 (6th Cir. 1943). Fair market value is defined as "the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable

knowledge of relevant facts." *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) (citing Treasury regulation definition).

Based on this measure the value of Collins' tickets was the price at which they would have changed hands between legitimate bettors and OTB. This price was the retail price or face value of the tickets. Accordingly, the tax court properly found that the stolen tickets were worth $80,280, their retail price, and this amount was correctly included in the taxpayer's gross income, as a gain from theft. From that figure Collins was entitled to a deduction for restitution he made to OTB in 1988. Collins returned to his till on July 17 winning tickets with a face value of $42,175. Thus, the tax court correctly determined that Collins' total taxable theft income for the year was $38,105 ($80,280 minus $42,175).

Collins, relying upon the Third Circuit's decision in *Zarin v. Commissioner,* 916 F.2d 110 (3d Cir.1990), asserts the stolen tickets were essentially valueless for tax purposes. In *Zarin* the taxpayer was a "high roller" at Resorts International Casino in Atlantic City with a $200,000 casino credit line. He incurred over $2.5 million in gambling debt at the casino, which he repaid in full. The New Jersey Casino Control Commission then identified Zarin as a compulsive gambler and enjoined Resorts from advancing him further credit. Resorts effectively ignored the Commission's order and kept lending its customer money. By January 1980 Zarin was spending 16 hours a day at the craps table, and eventually lost a total of $3.4 million, an amount he could not repay. Resorts sued to collect and Zarin asserted as a defense that Resorts' claim was unenforceable because it had violated the Commission's order. Zarin then settled the Casino's claim by agreeing to pay it $500,000. *See id.* at 112.

The IRS subsequently audited Zarin and declared a deficiency in taxpayer's taxes. It claimed that by settling his suit with Resorts, Zarin had cancellation of indebtedness income in the amount of $2.9 million—the difference between his gambling debt of $3.4 million and the $500,000 he paid to settle it. *See* 26 U.S.C. § 108. A divided tax court

upheld the IRS' position. *See Zarin v. Commissioner*, 92 T.C. 1084, 1989 WL 52678 (1989).

The Third Circuit, also divided, rejected the IRS' claim and reversed. The appellate court concluded that Zarin had no income from cancellation of Resorts' debt because he had no "indebtedness," as that term is defined by the Internal Revenue Code. It ruled that in order to demonstrate indebtedness, the IRS had to prove, under 26 U.S.C. § 108(d)(1), that Zarin either (1) was liable to Resorts on the debt or (2) held "property" subject to the debt. The court found the IRS could make neither showing. Under the first part of the test, Zarin was not liable on the debt because Resorts' $3.4 million loan was issued in violation of the New Jersey Casino Control Commission's order and was not enforceable under New Jersey law. *Zarin*, 916 F.2d at 113. Under the second part, the Third Circuit held the gambling chips Zarin acquired with Resort's loan were not property because they had "no independent economic value." It reached this conclusion because the chips could not be used outside the casino, only having value as a means of facilitating gambling within the casino itself. *Id.* at 113–14.

Collins seizes on this second point, insisting that like Zarin he stole opportunities to gamble and that his stolen racing tickets—like Zarin's gambling chips—had no intrinsic economic value. He thinks therefore that his taxable gain from the theft of the tickets was zero.

In disposing of that erroneous assumption, we observe that the statement in *Zarin* regarding the value of the casino's gambling chips was offered as part of the appellate court's interpretation of the narrow income exclusion provision of § 108(d) of the Code. Section 108(a) excludes from gross income the amount of the discharge of a taxpayer's indebtedness and § 108(d), just discussed, defines indebtedness. We are not convinced that the Third Circuit's reasoning is applicable outside the context of § 108 and the specific facts of that case where nothing was stolen and there was no embezzlement. *Cf.* Daniel Shaviro, *The Man Who Lost too Much:* Zarin v. Commissioner *and the Mea-surement of Taxable Consumption*, 45 Tax L.Rev. 215, 252–58 (1990) (criticizing the *Zarin* court for ignoring § 61 of the Internal Revenue Code). *Zarin* may have been written differently had the Third Circuit been confronted with the separate question of whether to include as gross income under § 61 the face value of stolen gambling opportunities.

*Zarin* we think is also inapposite because it involved a consensual transaction between Resorts Casino and the taxpayer that impacted no other parties. Zarin's gambling did not cause Resorts to transfer any money from the casino to third parties, nor did it affect other players at the gaming tables. In the instant case, Collins' wagers had external consequences beyond his tax liability. His bets affected the odds of the races at the Finger Lakes Track and impacted the payouts on those races on July 17. Further, OTB had to pay the Finger Lakes Track $38,105, the face value of the losing tickets. Hence, the betting tickets here had independent and measurable economic value, and resulted in a true loss to OTB. Consequently, we regard the fair market value of the stolen gambling tickets to be the proper measure of Collins' taxable gain in 1988.

## CONCLUSION

For the reasons stated, the decision of the tax court is accordingly affirmed.