T.C. Memo. 1997-122


UNITED STATES TAX COURT


STEPHEN P. AND JUTTA A. MARANTO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19822-95.              Filed March 10, 1997.


Stephen P. and Jutta Maranto, pro sese.

James J. Posedel, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, Judge:  Respondent determined a deficiency of $10,810

in petitioners' 1991 Federal income tax.  Respondent further

determined an addition to tax pursuant to section 6654[1] in the

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable year in
issue, and all Rule references are to the Tax Court Rules of
                                        (continued...)

amount of $769 and an accuracy-related penalty pursuant to section 6662(a) in the amount of $2,162.

After concessions by respondent, the issues remaining for decision are: (1) Whether the period of limitations for the assessment of a deficiency had expired at the time of the issuance of the notice of deficiency; (2) whether petitioners had unreported Schedule C income in the amount of $15,000; (3) whether petitioners are entitled to exclude from income $300 that they received from the Herkeios Group as reimbursement for educational expenses; (4) whether petitioners are entitled to exclude $1,688.92 that they received from the Herkeios Group as reimbursement for health care expenses; and (5) whether petitioners are liable for an accuracy-related penalty pursuant to section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in San Diego, California, when they filed their petition in this case. For all relevant periods, petitioners were cash basis taxpayers.

On February 12, 1991, petitioners transferred J.S. Khalsa Co., their high-rise window-washing business, into a trust called

---

[1](...continued)
Practice and Procedure.

the Herkeios Group.[2]  Petitioners paid $2,950 to Freedom Enterprises for a trust package which they used to convey the business, and they received no consideration from the Herkeios Group in the exchange.

The Herkeios Group continued to operate the window-washing business under the name of J.S. Khalsa.  Mr. Maranto served as the general manager, and he performed accounting and bookkeeping services, handled bidding work, and washed windows.  Following the transfer to the trust, the gross receipts from the business were deposited into an account at International Savings Bank in San Diego, California.  Mr. Maranto was a signatory to this account.

Beginning in March 1991, petitioners executed five unsecured "Universal Notes" in favor of the Herkeios Group.  These notes were in the following amounts and bore the following interest rates:

| Date | Amount | Promisee | Interest Rate | Payment Date |
|------|--------|----------|---------------|--------------|
| 3/31/91 | $4,000 | Herkeios Group | 5 percent | 3/31/92 |
| 5/10/91 | 1,100 | Herkeios Group | 5 percent | 5/10/92 |
| 5/28/91 | 3,400 | The Herkeios Group - Alex Yung, Trustee | 0 percent | 5/28/91 |
| 6/19/91 | 1,000 | Herkeios Group dba J.S. Khalsa Co. | 5 percent | 12/31/91 |
| 7/29/91 | 2,500 | J.S. Khalsa Co. (The Herkeios Group) | 5 percent | 7/19/92 |

---

[2]Mr. Maranto started J.S. Khalsa Co. in 1985 and operated it as a proprietorship before the transfer to the Herkeios Group.

Petitioners did not fill out either a credit or loan application prior to receipt of the funds reflected in the Universal Notes.

On August 19, 1991, petitioners and Alex Yung, as trustee of the Herkeios Group, entered into a Credit Agreement, which extended petitioners a $25,000 unsecured line-of-credit at 5-percent interest. Petitioners did not complete a loan or credit application for purposes of the Credit Agreement. Petitioners received $3,100 of funds in 1991 pursuant to this agreement.

Mr. Maranto wrote several checks to himself on the account of J.S. Khalsa during 1991, including checks advancing funds to petitioners pursuant to the Universal Notes. Petitioners deposited the funds received pursuant to the Universal Notes and Credit Agreement, which totaled $15,100, into their checking and savings accounts at Grossmont Bank in San Diego, California.

On Schedule C (Profit or Loss From Business) of their 1991 Federal income tax return, petitioners included as part of gross receipts $2,450, which represented Mr. Maranto's compensation for 1991 from the Herkeios Group. Apart from the $2,450, petitioners also reported a net profit from the business of $1,756.23. On their 1990 return, petitioners had reported a net profit from J.S. Khalsa of $43,920.

The Herkeios Group did not provide Mr. Maranto with a Form W-2 for 1991. Mr. Maranto had no other employment during this time.

Mrs. Maranto was employed as a Deputy Clerk for the County of San Diego during this time, and her gross salary for 1991 was $19,708.05.

## Petitioners' Educational and Health Care Expenses

In May 1991, petitioners paid $300 to National Note, Inc., for the Behle Real Estate Education Correspondence Course, a home-study course on investments in real estate trust deeds. Petitioners received $300 from the Herkeios Group as reimbursement for educational materials, which was deposited into their joint checking account at Grossmont Bank.

On September 25, 1991, petitioners received $1,688.92 from the Herkeios Group as reimbursements for health expenses, which was deposited into their joint checking account at Grossmont Bank.

## Proceedings in the U.S. District Court for the Southern District of California

On August 24, 1994, respondent issued a third-party recordkeeper[3] summons to International Savings Bank with respect to petitioners' 1991 Federal income tax return. On September 13, 1994, petitioners filed a petition with the U.S. District Court

---

[3]Sec. 7609(a)(3)(A) defines a "third-party recordkeeper" to include "any mutual savings bank, cooperative bank, domestic building and loan association, or other savings institution chartered and supervised as a savings and loan".

for the Southern District of California to quash the summons.  On September 22, 1994, respondent withdrew the summons, and the District Court entered an order denying the petition to quash on October 25, 1994.

On November 30, 1994, respondent issued another third-party recordkeeper summons to International Savings Bank requesting information concerning petitioners' 1991 taxable year. Petitioners filed a motion to quash the summons on December 20, 1994.  The District Court entered its order denying the petition to quash and enforcing the summons on March 13, 1995.

On June 29, 1995, respondent issued a notice of deficiency.

OPINION

The first issue we must decide is whether the period of limitations for assessment of a deficiency had expired when respondent issued the notice of deficiency in this case.  Section 6501(a) sets forth the general rule that respondent shall assess an income tax within 3 years from the date the taxpayer's return is filed.  Section 7609(e)(1) suspends the period of limitations when a taxpayer initiates a proceeding to quash a third-party recordkeeper summons issued with respect to that taxpayer's liability.  In such a case, the period of limitations "shall be suspended for the period during which a proceeding, and appeals

therein, with respect to the enforcement of such summons is pending." Sec. 7609(e)(1).[4]

Petitioners timely filed their 1991 Federal income tax return. The period of limitations for assessment of any deficiency in petitioners' 1991 Federal income taxes normally would have expired on April 17, 1995, since April 15, 1995, was a Saturday. See sec. 7503. Respondent issued the notice of deficiency on June 29, 1995, 73 days later.

However, on August 24 and November 30, 1994, respondent issued summonses to International Savings Bank requesting information with respect to petitioners' 1991 taxable year. Petitioners filed motions to quash both summonses in the U.S. District Court for the Southern District of California. With respect to the second summons, petitioners filed their motion to quash on December 20, 1994, and the District Court entered its order denying the petition and enforcing the summons on March 13, 1995.[5] The period from the date of petitioners' filing of their

_____

[4]Sec. 301.7609-5(b), Proced. & Admin. Regs., provides that the period of suspension "begins on the date the petition to quash the summons is filed in district court. This period continues until all appeals are disposed of, or until the expiration of the period in which an appeal may be taken or a request for a rehearing may be made." This regulation has been upheld as a reasonable interpretation of sec. 7609(e). Hefti v. Commissioner, 97 T.C. 180, 196 (1991), affd. 983 F.2d 868 (8th Cir. 1993).

[5]See Fed. R. Civ. P. 58 ("A judgment is effective only when so set forth and when entered as provided in Rule 79(a).").

motion to quash to the date of entry of the court's order was 83 days. Thus, even without taking into account the period during which the petition to quash the original summons was pending, or the period for an appeal, we find that the notice of deficiency was issued to petitioners within the period of limitations. See sec. 7609(e)(1).

The second issue for decision is whether petitioners had $15,000 of unreported Schedule C income for 1991. Petitioners contend that the funds in question were loans from the Herkeios Group. Borrowed funds are excluded from a taxpayer's gross income, "because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets". United States v. Centennial Sav. Bank FSB, 499 U.S. 573, 582 (1991). The hallmarks of a loan are: (1) Consensual recognition between the borrower and the lender of the existence of the loan (i.e., the obligation to repay); and (2) a bona fide intent on the part of the borrower to repay the funds advanced. Collins v. Commissioner, 3 F.3d 625, 631 (2d Cir. 1993), affg. T.C. Memo. 1992-478. Whether a debtor-creditor relationship exists is a question of fact. Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. 905, 909 (1970). Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners have presented copies of the five Universal Notes in question, as well as a copy of the Credit Agreement with the Herkeios Group.  However, these allegedly objective economic indicia of debt are little more than additional declarations of intent without any accompanying objective economic indicia of debt.  Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 495 (1980).

Petitioners contend that they have since repaid the alleged loans, but they have failed to offer any documentary evidence of repayment.  R. Richard Evans, the current trustee of the Herkeios Group, testified at trial that he had become aware that the advances were repaid.  However, Mr. Evans was not the trustee when the advances were made in 1991, and he did not provide any loan repayment documents to substantiate that the funds were, in fact, repaid.

In addition, Mr. Maranto's own testimony regarding both the Herkeios Group and the purported loans was unpersuasive.  For instance, in response to respondent's question as to whether he was the grantor or settlor of the Herkeios Group trust, Mr. Maranto testified:  "I can't say with certainty, but I don't believe so.  What I'm certain of is that it [the Herkeios Group] doesn't belong to me.  I could be fired at any time."  When asked by respondent whether the Herkeios Group had existed before the

transfer of the window-washing business, Mr. Maranto stated: "I can only assume so. You know, that's not information I'm privy to."

Mr. Maranto testified that he did not fill out either a credit or loan application before receiving funds pursuant to the Universal Notes or the Credit Agreement. The Universal Notes were unsecured. Four of the notes had a 5-percent interest rate, while one bore no interest at all. The terms of the Credit Agreement provided petitioners with an unsecured line-of-credit for $25,000 at 5-percent interest. When asked by respondent how he was able to obtain such favorable terms, Mr. Maranto testified that he simply "negotiat[ed] with the [Herkeios Group's] information officer who trusted me".

Mr. Maranto further testified that he and Mrs. Maranto did not receive any consideration for the transfer of their window-washing business to the Herkeios Group. Rather, petitioners paid $2,950 to Freedom Enterprises for a trust package used to transfer the business to the trust. Moreover, Mr. Maranto served as general manager of the trust in 1991 but reported compensation of only $2,450. On their Schedule C for 1991, petitioners reported a net profit from the business of only $4,206.23, and this amount included Mr. Maranto's compensation from the trust. On their Schedule C for 1990, petitioners reported a net profit of $43,920.

Petitioners have not established that the so-called "loans" were bona fide loans as opposed to income.  Rather, the evidence indicates that petitioners attempted to use the trust to funnel the income earned from their window-washing business to themselves under the guise of loans.  We conclude that the funds in issue constitute unreported income.  Accordingly, we sustain respondent's determination of additional income in the amount of $15,000.[6]

The third issue for decision is whether petitioners are entitled to exclude from income $300 that they received from the Herkeios Group in 1991 as reimbursement for educational expenses. Petitioners purchased a home-study course on investments in real estate trust deeds, and they now argue that the $300 reimbursement received from the Herkeios Group is excludable from income.  We disagree.

Section 127(a)(1) provides that "Gross income of an employee does not include amounts paid or expenses incurred by the employer for educational assistance to the employee if the assistance is furnished pursuant to a program which is described in subsection (b)."  Subsection (b)(1), in turn, defines an "educational assistance program" as a "separate written plan of

---

[6]The record indicates that respondent understated her computation of income.  Par. 8 of the stipulation of facts incorrectly states that the Herkeios Group made an advance of $1,000 to petitioners in May 1991.  The relevant exhibit lists the amount of the advance at $1,100.

an employer for the exclusive benefit of his employees to provide such employees with educational assistance."  Both Mr. Maranto and Mr. Evans testified that Mr. Maranto was not an "employee" of the Herkeios Group.  Mr. Evans testified that Mr. Maranto had a contractual relationship with the trust to provide certain services.  In addition, petitioners presented no evidence of any written plan setting forth the Herkeios Group's educational assistance program as required in section 127(b)(1).  We, therefore, sustain respondent's determination.

The next issue for decision is whether petitioners are entitled to exclude from income $1,688.92 that they received from the Herkeios Group in 1991 as reimbursement for health care expenses. Petitioners contend that this amount is excludable from income.  We disagree.

Section 105(b) provides in certain cases for the exclusion from gross income of amounts paid by an employer to an employee as reimbursement for medical expenses incurred by the employee, his spouse, or dependents.  However, we have already found that Mr. Maranto was not an employee of the Herkeios Group.  Moreover, section 6039D(a) requires employers who maintain a "specified fringe benefit plan", to file a return each year listing certain relevant information.  A plan maintained pursuant to section 105 is a "specified fringe benefit plan".  Sec. 6039D(d)(1).  Petitioners produced no evidence that the Herkeios Group filed

the necessary return. Thus, we sustain respondent's determination.

Finally, respondent determined that petitioners are liable for an accuracy-related penalty under section 6662. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent asserts that the entire underpayment in issue was due to petitioners' negligence or disregard of rules or regulations. Sec. 6662(b)(1). Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791 (1972).

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. A position with respect to an item is attributable to negligence if it lacks a reasonable basis. Sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. Petitioners have offered no evidence in this case to demonstrate that the underpayment in question was not attributable to their negligence or disregard of rules or regulations. Accordingly, we sustain respondent's determination.

We have considered all of petitioners' arguments, and, to the extent not discussed herein, find them to be irrelevant or without merit.

<u>Decision will be entered under Rule 155</u>.