FREDERIC SCHWARTZ, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket No. 2064-91
United States Tax Court
T.C. Memo 1994-320; 1994 Tax Ct. Memo LEXIS 327; 68 T.C.M. (CCH) 63; July 13, 1994, Filed *327 Decision will be entered under Rule 155. In 1981 P, an attorney, tried to buy a lithograph package known as Green Sonata. P was a one-third partner in a partnership (E). P was in control of E's books and records and E's bank account. Without his partners' knowledge or permission, P took from E amounts in excess of his allocable share of income for 1982 and 1983. 1. Held: P is not entitled to a depreciation deduction or an investment credit on account of Green Sonata for 1981. Secs. 167(a), 38(a), I.R.C. 1954. 2. Held, further, P Must take into income for 1982 and 1983 the amounts of his excess withdrawals from E, and is not entitled to relief under Sec. 1341. Secs. 61(a), 1341, I.R.C. 1954. 3. Held, further, P had additional income for 1982 and 1983 as shown by unexplained deposits into his individual bank accounts; amounts determined. Sec. 61(a), I.R.C. 1954. 4. Held, further, P is liable for additions to tax under Sec. 6651(a)(1), I.R.C. 1954 (1982, 1983, and 1984); Sec. 6653(a), I.R.C. 1954 (1981, 1982, 1983, and 1984); sec. 6659, I.R.C. 1954 (1981); and Sec. 6661, I.R.C. 1954 (1983). 5. Held, further, P is liable for increased *328 interest under Sec. 6621(c), I.R.C. 1954 and 1986 (1981). Frederic Schwartz, Jr., pro se. For respondent: Karen E. Chandler
CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6651(a)[1] (failure to file timely tax returns), 6653(a) (negligence, etc.), 6659 (valuation overstatement), and 6661 (substantial understatement of income tax) against petitioner as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec. Sec. Year
Deficiency [1]
6651(a)(1)
6653(a)(1)
6653(a)(2)
6659
6661
1981
$ 6,066
-- $ 303
[2]
$ 1,820
--  1982
1,024
$ 256
51
[2]
--  --  1983
24,806
6,202
1,240
[2]
--  $ 6,202
1984
25,590
6,398
2,096
[2]
--  --  Also, respondent determined that petitioner is liable under section 6621(c) for an increased rate of interest on the entire 1981 deficiency. *329 By amendment to answer, respondent asserts an increased deficiency for 1982 in the amount of $ 10,147, for a total 1982 deficiency of $ 11,171, as well as corresponding increases in the additions to tax under section 6651(a)(1) and paragraphs (1) and (2) of section 6653(a). See Sec. 6214. After concessions by both parties, the issues for decision [2] are as follows: (1) Whether petitioner is entitled for 1981 to a depreciation deduction and an investment credit attributable to his alleged purchase of the Green Sonata lithograph package that year. *330 (2) Whether petitioner must take into income for 1982 and 1983 the amounts of his excess withdrawals from a partnership in those years, and, if so, then whether he is entitled to section 1341 relief for 1984. (3) Whether petitioner had additional unreported income for 1982 and 1983, and, if so, then in what amounts. (4) Whether petitioner is liable for additions to tax for failure to timely file income tax returns for 1982, 1983, and 1984. (5) Whether petitioner is liable for additions to tax on account of negligence, etc., for 1981, 1982, 1983, and 1984 and, if so, then how much of the underpayment for each of these years is due to this negligence, etc. (6) Whether petitioner had a valuation overstatement with respect to the Green Sonata lithograph package for 1981 within the meaning of section 6659(c). (7) Whether petitioner is liable for an addition to tax under section 6661 on account of that part of petitioner's 1983 deficiency that results from his failure to report his excess withdrawals from the partnership. (8) Whether petitioner's 1981 tax return claims as to the Green Sonata lithograph package resulted in a substantial underpayment of tax attributable to a tax motivated *331 transaction within the meaning of section 6621(c). FINDINGS OF FACT [3]
*332 Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner resided in Washington, D.C. 1. Background
Throughout the period 1968 to late 1981, petitioner was employed as a lawyer full time by the U.S. Department of Transportation. From late 1981 on, petitioner was a lawyer in private practice in Washington, D.C. Petitioner is not a tax lawyer. 2. Green Sonata
In 1976, petitioner joined the Board of Trustees of the Corcoran Gallery of Art (hereinafter sometimes referred to as the Corcoran Gallery) and the Corcoran School of Art (hereinafter sometimes referred to as the Corcoran School). As a trustee of the Corcoran Gallery, petitioner identified artists whose works might be exhibited at the Corcoran Gallery, and identified potential faculty members of the Corcoran School. Petitioner also represented about a dozen artists in negotiating art gallery contracts, reproduction rights, and sale of poster and postcard reproduction rights, and in suing art galleries. In connection with both of his trustee offices, petitioner became acquainted *333 with Gene E. Davis (hereinafter sometimes referred to as Davis), an artist who taught at the Corcoran School. Davis was a well-known artist. Petitioner represented Davis in all Davis' legal matters from 1976 until Davis' death in 1985. By 1981, petitioner had also been Davis' close adviser for 5 years. As Davis' attorney, petitioner became involved in dealing with art galleries, advising Davis about participating in art tax shelter lithograph programs, and valuing Davis' paintings in preparing Davis' estate plan. Part of the work that petitioner did for Davis in 1981 was to review tax shelter documents. Petitioner's fee for his work for Davis on any such shelter was an artist proof from the lithograph involving that shelter. However, petitioner did not receive these fees. In November 1981, Davis told petitioner that an option for a lithograph package based on one of Davis' works entitled Green Sonata was not being exercised. [4] Petitioner told Davis that petitioner was interested in buying Green Sonata. At the time, petitioner had recently left the Department of Transportation and was a lawyer in private practice. *334 Petitioner thought Green Sonata's value was grossly overstated and offered to buy it at a low price. A printer made 250 commercial prints, [5] 30 artist proofs, and 10 "H.C.'s" [6] of Green Sonata. Davis numbered and signed all of the Green Sonata prints and proofs. At the time of his activities with regard to Green Sonata, petitioner believed that respondent would regard the Green Sonata transaction as a tax shelter and would investigate the matter. Petitioner believed at that time that he had to be able to prove that the agreement between himself and Davis was fair, that the purchase price was fair, and that he had more of a chance of making a profit on the transaction than he did from his incipient legal practice. Petitioner did not use the services of a tax adviser for the Green Sonata transaction. *335 Elizabeth Weiner (hereinafter sometimes referred to as Weiner) had a gallery in New York City. She acted as an intermediary for Davis, the printer, and the promoter of the art tax shelter lithograph program. on or about December 17, 1981, petitioner wrote a letter to Weiner, directing her to (1) offer to the printer 15 to 20 prints in lieu of the $ 1,500 the printer was owed, and (2) forward to Davis the master, [7] regular edition prints, and 20 artist proofs, less those given to the printer. The letter states that Davis has agreed to pay $ 1,000 to Weiner when Davis receives the prints, and allows Weiner to remove and retain "the 10 H.C. prints and an additional 10 Artist Proofs." The letter also states that Davis agrees that he "will at all times hereafter indemnify you, [Weiner] against all actions, proceedings, claims, and demands by reason of the delivery of the prints and master to him." The letter never reached Weiner. When the Postal Service returned to petitioner his letter addressed to Weiner, petitioner tried to telephone her. Weiner's telephone had been disconnected. Davis did not remember which printer had been contracted to prepare the lithograph package. Petitioner *336 wrote a letter to Davis dated December 31, 1981. The letter states in part as follows: Dear Gene, As we discussed, I have agreed to purchase the master Green Sonata for $ 76,062.00. This is to be paid as follows. One thousand dollars is enclosed. Two thousand five hundred dollars is payable upon delivery of the master/works when Liz [Weiner] returns from Europe. Further, a recourse note in the amount of $ 72,562 is executed. Incorporated by reference in this agreement unless inconsistent are the terms of the artist option purchase agreement between you and Art Reproduction Trading Co. dated November 26, 1979. It is understood that the edition will be reduced under the arrangement with Liz [Weiner] and the printer, and that the law of the District of Columbia rather than Texas will apply.
The check for the $ 1,000 referred to in the letter to Davis was never negotiated. In 1984 respondent asked petitioner to provide substantiating documents for the claimed 1981 purchase. After Davis and Davis' wife could not find the 1981 $ 1,000 check, on or about September 29, 1984, petitioner gave to Davis' wife another $ 1,000 check, which was cashed on October 5, 1984. (Petitioner *337 had understood that Davis would not cash this check.) The $ 2,500 debt referred to in the letter to Davis has not been paid. The $ 72,562 recourse note referred to in the letter to Davis has not been paid, in whole or in part. The purchase agreement referred to in the letter to Davis provides in pertinent part as follows: 1. OPTION. * * * * C. Buyer shall have the right, for five (5) business days after receipt of the Masters, or images substantially similar thereto, to exercise the option to purchase any one, some or all of the Masters.
* * * * 3. PURCHASE AND SALE OF THE PROPERTY. Artist hereby agrees to sell, assign and transfer to Buyer, and Buyer hereby agrees to purchase when it exercises the option, or options, all right, title and interest in the Property throughout the world, in perpetuity, * * *
* * * * 5. PURCHASE PRICE. A. Upon execution of this Agreement *338 the Buyer shall make a nonrefundable payment of * * * to the Artist for the right and option to purchase said Masters during the current calendar year. This sum shall be applied to the cash portion of the purchase price for the first Master purchased from Artist.
Petitioner's failure to pay the $ 2,500 due on the delivery of Green Sonata to him constitutes a default under the purchase agreement. The terms of the recourse note provide that the note is due and payable in full on any default under the purchase agreement. The $ 1,000 1984 check is petitioner's only out-of-pocket investment with respect to Green Sonata. Davis died on April 6, 1985. Weiner telephoned petitioner or Davis' widow in 1985 after Weiner learned of Davis' death. Weiner delivered Green Sonata to petitioner in 1985. Petitioner did not make any payment to Davis' widow or Davis' estate upon delivery of Green Sonata to him. Although petitioner was an executor of Davis' estate, and signed the estate tax return, the $ 72,562 recourse note was not listed as an asset of the estate on the estate tax return for Davis' estate. Davis' widow died before the trial in the instant case. On his 1981 tax return, petitioner *339 included a Schedule C for his "marketing and production" activities. The only entry on the Schedule C is an $ 11,409.30 depreciation deduction. This depreciation deduction derives from petitioner's claim, on Form 4562, that he had a $ 76,062 basis in Green Sonata, that Green Sonata is "5-year property", and that he placed Green Sonata in service in December 1981. Also, petitioner claimed an investment credit of $ 7,606.20 for Green Sonata for 1981. Petitioner did not report this "marketing and production" business, nor did he take a depreciation deduction or investment credit for Green Sonata, in later years. 3. Eastin Partnership
In 1982, petitioner and his father and his sister formed Eastin Company, a partnership (hereinafter sometimes referred to as the Partnership), which advised Far Eastern entities about marketing goods imported into the United States. The Partnership filed its tax returns on a calendar year basis. The Partnership's bank account, opened August 20, 1982, was kept in a Washington, D.C., bank; petitioner was in charge of that bank account. In 1982, $ 31,353.63 of income was deposited into the Partnership's bank account. The same amount was reported *340 as income on the Partnership's 1982 tax return, which petitioner prepared. In 1982, $ 13,413 of the money in the Partnership's bank account was transferred to petitioner's individual bank account. On his 1982 tax return, petitioner reported his distributive share of the Partnership's income, $ 10,451.21. Petitioner did not report on his 1982 tax return the remaining $ 2,961.79 that he transferred from the Partnership's bank account to his individual bank account. In 1983, $ 54,848 of income was deposited into the Partnership's account. On its 1983 tax return, which petitioner prepared, the Partnership reported $ 39,584 gross receipts, $ 2,910.86 expenses, and $ 36,673.14 taxable income. Petitioner failed to include in the Partnership's income, as reported on its tax return, the $ 15,264 deposit made to the Partnership's bank account on April 25, 1983. In 1983, $ 41,208 of the money in the Partnership's bank account was transferred to petitioner's individual bank account. On his 1983 tax return, petitioner reported $ 14,580.80 as income from the Partnership, slightly less than 40 percent of the ordinary income that the Partnership reported on its 1983 tax return, and about *341 28 percent of the ordinary income that the Partnership should have reported on its 1983 tax return. Petitioner did not report on his 1983 tax return the remaining $ 26,627.20 that he transferred from the Partnership's bank account to his individual bank account. Petitioner did not tell his partners that he was taking from the Partnership more than his distributive share of the Partnership's income; he was not authorized by his partners to make excess withdrawals. The Partnership did not intend to lend the excess withdrawals to petitioner. Petitioner did not execute any loan agreements or other formal indicia of his obligation to repay the excess withdrawals. Petitioner made the excess withdrawals in order to get money to pay his living expenses. The Partnership was dissolved in 1984. The only information about the Partnership that appears on petitioner's 1982 tax return is the Schedule E, part II, entry of $ 10,451.21 for "EASTIN CO." That amount is combined with a loss from another partnership, and the net income of $ 9,648.04 is then carried to line 18 of the Form 1040. The only information about the Partnership that appears on petitioner's 1983 tax return is the Schedule *342 E, part II, entry of $ 14,580.80 for "EASTIN CO." That amount is combined with a loss from another partnership, and the net income of $ 13,286.35 is then carried to line 18 of the Form 1040. The only information about the Partnership that appears on petitioner's 1984 tax return is the Schedule E, part II, entry of $ 43,976.96 for "EASTIN CO." That amount is combined with a net loss from another partnership, and the net income of $ 42,630.37 is then carried to line 18 of the Form 1040. 4. Other Income
Petitioner maintained several individual accounts at the same Washington, D.C., bank at which he maintained the Partnership's bank account. Table 1 shows the amounts of his 1982 deposits to his individual bank accounts, and nontaxable sources of many of those deposits. Table 1 Personal
Personal Business
Savings Checking Checking
Totals Total Deposits
$ 4,000
$ 43,789.34
$ 16,240
$ 64,029.34
Sources
Transfers between
2,500
15,450.00
11,480
29,430.00
accounts
Riggsline loans
-- 9,288.00
-- 9,288.00
Returned check
-- 358.96
-- 358.96
Bank rebate
-- 12.50
-- 12.50
Totals
2,500
25,109.46
11,480
39,089.46
Other Sources
1,500
18,679.88
4,760
24,939.88
*343 Table 2 shows the status of the $ 24,939.88 1982 deposits not accounted for in table 1. Table 2 Other sources
$ 24,939.88
Transfers from the Partnership
13,413.00
11,526.88
Gross income reported, other than
from the Partnership
6,079.50
Other sources -- disputed
5,447.38
Table 3 shows the amounts of petitioner's 1983 deposits to his individual bank accounts, and nontaxable sources of many of these deposits. Table 3 Personal Business Checking Checking Totals Total Deposits
$ 67,561.98
$ 34,369.84
$ 101,931.82
Sources
Transfers between
3,270.55
21,543.00
24,813.55
accounts
Riggsline loans
1,955.62
--  1,955.62
Returned checks
1,318.35
--  1,318.35
Tax refunds
11,306.90
--  11,306.90
Medical insurance
3,956.00
--  3,956.00
reimbursements
Totals
21,807.42
21,543.00
43,350.42
Other Sources
45,754.56
12,826.84
58,581.40
Table 4 shows the status of the $ 58,581.40 1983 deposits not accounted for in table 3. Table 4 Other sources
$ 58,581.40
Transfers from the Partnership
41,208.00
17,373.40
Gross income reported, other than
from the Partnership
11,230.29
Other sources -- disputed
6,143.11
*344 5. Tax Returns
Petitioner filed his 1981 tax return on January 3, 1983, his 1982 and 1983 tax returns on March 17, 1986, and his 1984 tax return on March 19, 1986. Table 5 presents selected information from petitioner's tax returns for the years in issue. Table 5 Item 1981
1982 1983
1984
Wages, etc.
$ 34,428.80 -0- -0- -0- Sched. C -- lawyer
5,500.00 $ 5,500.00 $ 10,647.79 $ 97,701.00 (total inc.)
Sched. C -- lawyer
(6,765.01)
(18,438.21)
(31,579.16)
(31,943.81)
(total deduc.)
Sched. C -- marketing
-0- -- -- -- (total inc.)
Sched. C -- marketing
(11,409.30)
-- -- -- (total deduc.)
Partnerships
Watergate
(189.42)
(803.17)
(1,294.45)
(1,346.59)
The Partnership
-- 10,451.21 14,580.80 43,976.96 Interest income
417.50 412.50 412.50 1,737.15 Dividends
162.00 167.00 170.00 137.50 Net operating loss
-- -- (5,730.67)
(19,409.82)
deduction
Adjusted gross income
21,982.57 (2,810.67)
(12,893.19)
90,752.74 Income tax (before
2,839.61 -0- -0- 17,170.74 credits)
Investment credit
8,202.67 -0- [1] -0- [1] 782.53 Self-employment tax
-0- -0- -0- -0- Prepayment credits
9,566.63 -0- -0- 14,000.00 *345 On his 1984 tax return, petitioner claimed the then available benefits of income averaging. The base period years are 1981, 1982, and 1983. Petitioner did not buy Green Sonata in 1981, he did not use it in his trade or business or hold it for the production of income in 1981, he did not place it in service in 1981, and he did not have a basis in it in 1981. Petitioner was negligent in taking a depreciation deduction and investment credit for Green Sonata for 1981. Petitioner was negligent in failing to report as income for 1982 and 1983 the excess withdrawals he made from the Partnership in 1982 and 1983. Petitioner was negligent in failing to report as income for 1982 and 1983 unexplained deposits to his individual bank accounts in 1982 and 1983. Petitioner did not have reasonable cause for failing to file his tax returns on time for 1982, 1983, and 1984. Petitioner did not adequately disclose on his tax returns for 1982, 1983, and 1984 the relevant facts affecting the tax treatment of his 1982 and 1983 excess withdrawals from the Partnership. OPINION I. Green Sonata Deduction, Credit -- 1981
Respondent claims that petitioner did not buy Green Sonata in 1981, and so *346 petitioner is not entitled to the claimed depreciation deduction and investment credit. In the alternative, respondent maintains that Green Sonata was not placed in service in 1981, that petitioner's 1981 basis in Green Sonata was zero, and that petitioner did not use Green Sonata in a trade or business or hold Green Sonata for the production of income in 1981. Petitioner claims that he did buy Green Sonata in 1981, that he did place it in service in 1981, that he did use it in a trade or business or hold it for the production of income in 1981, and that his basis was $ 76,062, as claimed in his 1981 tax return. We agree with respondent. Deductions are allowable for a taxpayer's ordinary and necessary expenses in carrying on a trade or business, sec. 162(a), [8] and for depreciation of property used in a trade or business or held for the production of income. Sec. 167(a). [9] *348 The basis for depreciation is the taxpayer's adjusted basis for determining gain or loss. Sec. 167(g). [10] Also, during the years in issue an investment credit was allowable with respect to tangible personal property, but only if depreciation was allowable with respect to that property. Sec. 48(a)(1)(A). *347 [11] Where a taxpayer never acquires the property in question, the taxpayer is not allowed to deduct the claimed expenses based on ownership, nor depreciation, nor (except for the pass-through provisions of section 48(d)) investment credit. E.g., Cherin v Commissioner, 89 T.C. 986 (1987); Zirker v. Commissioner, 87 T.C. 970 (1986); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). *349 In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Estate of Schneider v. Commissioner, 88 T.C. 906, 938 (1987), affd. 855 F.2d 435 (7th Cir. 1988). Whether the substance of a transaction is a sale for Federal tax purposes is a question of fact, determined by reference to all the surrounding facts and circumstances including the form chosen by the parties to the transaction. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Yamamoto v. Commisssioner, 73 T.C. 946 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982). The overwhelming impression created by the evidence of record in the instant case is that petitioner and Davis did not act as though petitioner had bought from Davis and Davis had sold to petitioner, the Green Sonata that purportedly was the subject of the late 1981 transaction. Petitioner tries to paint an interesting picture. He tells us that *350 he bought Green Sonata from Davis in December 1981 for $ 76,062. By then, petitioner had been a lawyer for at least 13 years, and had been Davis' lawyer for 5 years. Yet, he cannot produce anything to evidence this substantial purchase except a letter from him to Davis, which memorializes an agreement by petitioner to make the purchase. He has no signature by Davis on this document. He has nothing from Davis stating that Davis sold, or agreed to sell, Green Sonata (or anything else) to petitioner. In addition, neither petitioner nor Davis acted as though there was a transaction that actually transferred the benefits and burdens of ownership to petitioner in 1981. As set forth in petitioner's December 31, 1981, letter to Davis, petitioner's claimed purchase price for Green Sonata is comprised of the elements described in table 6. Table 6 Element
Amount
Check enclosed with letter
$ 1,000
Payable on delivery of the "master/works"
2,500
Recourse note
72,562
Total
76,062
Petitioner testified that he delivered the $ 1,000 check (together with the letter and the note) to Davis on December 31, 1981, and that the check was not cashed "because the-works of art had *351 not been made available or delivered as per our agreement." This evidence as to the $ 1,000 check is inconsistent with petitioner's claim to have bought Green Sonata in 1981, placed it in service in 1981, and used it in his trade or business or held it for the production of income in 1981. At most, it suggests that petitioner and Davis, if they entered into an agreement at all in 1981, entered into an executory contract. Petitioner testified as follows: The situation [as to his purported purchase of Green Sonata] remained, in essence, in a status quo. I believe I asked Mr. Davis about the matter once or twice more over the succeeding several years, and we decided that we would do nothing more in terms of the project, because it was still our belief that Ms. Weiner could not have disappeared, that the prints had to be somewhere and they would, in fact, reappear.
In 1984 respondent asked petitioner to provide substantiating documents for the claimed 1981 purchase. When Davis and Davis' wife could not find the 1981 $ 1,000 check, on or about September 29, 1984, petitioner gave a replacement check to Davis' wife. The check was cashed on October 5, 1984. Petitioner was surprised *352 when the check was cashed. He testified that "I thought she [Davis' wife] would not cash it because she was -- because the prints had not been produced yet." The foregoing makes it clear that, at least until October 5, 1984, nothing had changed as to the status of Green Sonata. Petitioner did not claim depreciation deductions as to Green Sonata on his tax returns for 1982 through 1984 (see supra table 5, Sched. C -- marketing), and he does not now claim them for 1982 through 1984, even as an alternative. We read this as an indication that petitioner concedes that (1) from 1982 through 1984 (the last of the years before the Court) petitioner was not using Green Sonata in his trade or business, or holding it for the production of income, and (2) the status of Green Sonata in 1982 through 1984 was unchanged from its status in 1981. This, too, suggests that petitioner had not completed the purchase of Green Sonata in 1981. Davis died on April 6, 1985. Weiner gave Green Sonata to petitioner in 1985. Although the December 31, 1981, agreement obligated petitioner to pay $ 2,500 to Davis "upon delivery of the master/works", and petitioner included this obligation in his basis *353 (see supra table 6), petitioner thought so little of this obligation that he did not pay the $ 2,500 after receiving Green Sonata. To us, the foregoing suggests that petitioner has not viewed the December 31, 1981, letter as imposing any meaningful obligation on him. Petitioner was an executor of Davis' estate. The retained copy of the estate tax return in evidence indicates that petitioner signed the estate tax return and that it was filed in 1986. Despite the facts that (1) petitioner had already received Green Sonata and (2) petitioner's recourse note evidences 95 percent of petitioner's claimed basis in Green Sonata (see supra table 6), that note is not listed on the estate tax return for Davis' estate. To us, the foregoing suggests that petitioner does not view the recourse note as having any value. Petitioner's only out-of-pocket investment on this purported 1981 purchase was the $ 1,000 check that he gave to Davis' wife in 1984, which was cashed much to his surprise. For this $ 1,000 surprise expenditure in 1984, petitioner still contends that he is entitled to an $ 11,409.30 deduction and a $ 7,606.20 investment credit for 1981. We conclude, and we have found, that *354 petitioner did not buy Green Sonata in 1981, he did not use it in his trade or business or hold it for the production of income in 1981, he did not place it in service in 1981, and he did not have a basis in it in 1981. It follows that petitioner is not entitled to the claimed depreciation deduction and investment credit on account of Green Sonata for 1981. Petitioner does not claim, even in the alternative, that he is entitled to the deduction or the credit for any other year in issue, and we do not believe that the record in the instant case would support any such claim. Petitioner testified, and maintains on brief, that his agreement with Davis was represented by three documents--petitioner's December 31, 1981, letter to Davis, the Artist Option Purchase Agreement referred to in that letter, and the recourse note for $ 72,562 referred to in that letter. As we have shown, petitioner largely ignored the obligations he supposedly undertook in this agreement. We conclude that the agreement represented by these documents did not accomplish a 1981 purchase of Green Sonata by petitioner. We hold for respondent on this issue. II. Eastin Partnership Income--1982, 1983
Respondent *355 claims that petitioner received unreported income from the Partnership's bank account in the amounts of $ 2,961.79 for 1982 and $ 26,627.20 for 1983. Petitioner acknowledges that he withdrew these unreported amounts from the Partnership's bank account and deposited them to his individual bank account, but contends that these amounts were borrowed from the Partnership during the years in issue and that he repaid the amounts in 1984. Respondent characterizes the withdrawals in excess of petitioner's allocated share as "misappropriations". Petitioner characterizes the withdrawals as something other than taxable income or an embezzlement because he made no effort to conceal the transfers; made full repayment less than 2 years later; and "did not have the intent to permanently deprive the other partners of the use and benefit of the fund, and did not do so." We agree with respondent. Neither side discusses the applicability of the partnership litigation provisions, subchapter C of chapter 63, section 6221 et seq. The Partnership filed its tax returns on a calendar year basis and evidently was created before September 4, 1982 (its bank account was opened August 20, 1982). There is *356 no suggestion that an election was filed under section 407(a)(3) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97248, 96 Stat. 324, 671, to have the partnership litigation provisions apply earlier than the September 4 general effective date. Accordingly, we conclude that the partnership litigation provisions do not apply to the Partnership's 1982 year. For 1983 (and 1984) the Partnership, with only three partners, qualifies under the "small partnership" exception of section 6231(a)(1)(B)(i). There is no suggestion that an election was filed under section 6231(a)(1)(B)(ii) to have the partnership litigation provisions apply. Accordingly, we conclude that the partnership litigation provisions also do not apply to the Partnership's 1983 (and 1984) years. See Trost v. Commissioner, 95 T.C. 560 (1990); Normac, Inc. & Normac International v. Commissioner, 90 T.C. 142, 146 (1988). Neither side discusses whether the proper tax treatment of petitioner's 1982 and 1983 excess withdrawals is at all affected by the partnership tax provisions, subchapter K of chapter 1, sec. 701 et seq. Petitioner does *357 not contend that the excess withdrawals should be treated as distributions under section 731(a). Essentially, the parties view their dispute on the excess withdrawals as a general section 61(a) matter. We have concluded that we, too, will view this as a general section 61(a) matter. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966). Section 61(a)[12] generally requires taxpayers to include in their gross income all income from whatever source derived. *358 We take as a basic text for the instant case the following paragraph from James v. United States, 366 U.S. 213, 219-220 (1961): When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil v. Burnet, * * * [286 U.S. 417,] 424 [(1932)]. In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," Corliss v. Bowers, [281 U.S. 376 (1930)]. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. When a law-abiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as "gross income" in the year received. United States v. Lewis, [340 U.S. 590 (1951)]; *359 Healy v. Commissioner, [345 U.S. 278 (1953)]. We do not believe that Congress intended to treat a law-breaking taxpayer differently. Just as the honest taxpayer may deduct any amount repaid in the year in which the repayment is made, the Government points out that, "If, when, and to the extent that the victim recovers back the misappropriated funds, there is of course a reduction in the embezzler's income." Brief for the United States, p.24. [Fn. ref. omitted.)
In the instant case, petitioner took the excess withdrawals--$ 2,961.79 in 1982 and $ 26,627.20 in 1983 [13] *361 without the knowledge or consent of the other partners. He used the excess withdrawals for his personal purposes. He does not contend that he repaid any of the excess withdrawals in 1982 or 1983. Unlike the situation in Gilbert v. Commissioner, 552 F.2d 478 (2d Cir. 1977), revg. T.C. Memo. 1976-104, to which-petitioner draws our attention, (1) petitioner does not contend that any purpose of the Partnership was to be served by the excess withdrawals; (2) petitioner did not promptly disclose his actions to either of his partners; *360 (3) petitioner did not promptly execute notes to the Partnership, secured by assignment of his property; and (4) as of the end of 1982 and the end of 1983, petitioner had "net accretion in real wealth on the overall transaction". Gilbert v. Commissioner, 552 F.2d at 481. Thus, Gilbert points up the shortcomings in petitioner's case, instead of supporting his contentions. See Collins v. Commissioner, 3 F.3d 625, 632 (2d Cir. 1993), affg. T.C. Memo. 1992-478, where the Court of Appeals that had issued Gilbert distinguished Gilbert for essentially the same reasons that we do in the instant case. [14]
We conclude that petitioner's excess withdrawals from the Partnership *362 are taxable as income to him for the years in which he made those withdrawals. Petitioner contends that, if we were to conclude that he received unreported income subject to tax, from the Partnership in 1982 and 1983, then we should conclude that he is entitled to a reduction in tax in 1984 under section 1341. Under section 1341(a)[15] a taxpayer may be allowed a deduction or a tax reduction if all of several statutory requirements have been met. See generally Maule, 502 T.M., Gross Income: Tax Benefit, Claim of Right and Assignment of Income, A27 through A-29 (1992). One of those requirements, in section 1341(a)(2), is that "a deduction is allowable for the taxable year". See sec. 1.1341-1(a)(1), Income Tax Regs.
*363 We assume that petitioner was a cash basis taxpayer. See Rubnitz v. Commissioner, 67 T.C. 621, 627 n.7 (1977). In general, a cash basis taxpayer is allowed to deduct an item only for the year in which actual payment is made. Sec. 461(a). We proceed to examine whether petitioner has proven that he repaid the excess withdrawals. Petitioner testified that (1) he repaid $ 5,000 to the Partnership in 1984, after he collected a large fee in his legal practice, and (2) at the end of 1984 he liquidated the Partnership and adjusted the payouts to the partners in such a manner as to undo the effects of his 1982 and 1983 withdrawals. Petitioner was charged with maintaining the Partnership's financial records; in 1984, respondent's agents had already been in touch with him regarding their examination of his 1981 tax return, and so it was obvious from respondent's request for 1981 documents that records must be made and kept; and Petitioner is an attorney and should understand the importance of maintaining the necessary records to track his asserted repayments. Eleven months after petitioner filed his petition in the instant case, the Court sent to the parties *364 a notice setting the case for trial 5 months thereafter. Accompanying the notice was the Court's Standing Pre-Trial Order, which provides in pertinent part as follows: Policies
You are expected to begin discussions as soon as practicable for purposes of settlement and/or preparation of a stipulation of facts. * * *
Requirements
To effectuate the foregoing policies and an orderly and efficient disposition of all cases on the trial calendar, it is hereby ORDERED that all facts shall be stipulated to the maximum extent possible. All documentary and written evidence shall be marked and stipulated in accordance with Rule 91(b), unless the evidence is to be used to impeach the credibility of a witness. Objections may be preserved in the stipulation. If a complete stipulation of facts is not ready for submission at trial, and if the Court determines that this is the result of either party's failure to fully cooperate in the preparation thereof, the Court may order sanctions against the uncooperative party. Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in *365 writing and exchanged by the parties at least 15 days before the first day of the trial session. The Court may refuse to receive in evidence any document or material not so stipulated or exchanged, unless otherwise agreed by the parties or allowed by the Court for good cause shown. * * *
Notwithstanding those explicit instructions, petitioner, an attorney, neglected to timely present to respondent documents that petitioner claimed would support his contentions as to the alleged 1984 repayments to the Partnership. At trial petitioner sought to offer such documents. We refused to accept them. Petitioner's conclusory testimony is not sufficient to carry his burden of proving that, in 1984 or any year before the Court, he repaid all or at least $ 3,000, sec. 1341(a)(3), of the excess withdrawals. Rule 142(a); Welch v. Halvering, 290 U.S. 111 (1933). Under these circumstances, it is not necessary for us to consider whether the other requirements for section 1341 relief have been met or whether petitioner is entitled to 1984 tax relief apart from the provisions of section 1341. Petitioner has not told us what Code provision he relied on to satisfy *366 his obligation under section 1341(a)(2) to show that his asserted repayment would be deductible for 1984. We are satisfied that his failure to show that he repaid the excess withdrawals in 1984 would be fatal to any claimed 1984 deduction. Thus, petitioner is not entitled to section 1341 relief and also is not entitled to a deduction for 1984. We hold for respondent on this issue. III. Other Income -- 1982, 1983
Respondent claims that petitioner received and failed to report additional taxable income in the amounts of $ 5,447.38 for 1982 and $ 6,143.11 for 1983. See supra tables 2 and 4. Petitioner claims that various deposits to his individual bank accounts represent proceeds from the sale of stock given to him by his father, redemptions of U.S. savings bonds, loans or gifts from his father, and reimbursements for medical expenses. Petitioner claims that he sold unidentified stock at a price equal to the basis he received from his father and that there would be no reason to report the sale. Petitioner also acknowledges that he received interest income from his U.S. saving bonds, but claims that his failure to report that income was an oversight. We agree in part *367 with petitioner and in part with respondent. Section 61(a) generally requires taxpayers to include in their gross income all income from whatever source derived. It is well established that bank deposits are evidence of income, where the deposits were made by the party charged with the income or to an account controlled by the party charged with the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Mauch v. Commissioner, 35 B.T.A. 617, 627 (1937), affd. 113 F.2d 555 (3d Cir. 1940). On the one hand, we note that petitioner was put on notice as early as 1984 that his tax return for 1981 was being examined and that substantiating documents were needed. Petitioner's 1982 and 1983 tax returns were filed in 1986, by which time he should have understood the importance of documentation. At that time it might have been relatively simple to obtain documentation of the alleged sale of the stock gift from his father, redemptions of U.S. savings *368 bonds, reimbursements of medical expenses, and at least some of the other gifts from his father. Petitioner's father, the claimed source of some undefined portion of the disputed bank deposits, was living in Providence, Rhode Island, at the time of the trial. Petitioner has not explained why he was unable to procure corroboration, either documentary or testimonial, for his generally vague explanations of these disputed deposits to his individual bank accounts. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). On the other hand, the parties have been able to agree on the sources of all but 8.5 percent of petitioner's 1982 bank deposits ($ 5,447.38 (table 2) of $ 64,029.34 (table 1)) and all but 6.0 percent of petitioner's 1983 bank deposits ($ 6,143.11 (table 4) of $ 101,931.82 (table 3)). Also, the matter is complicated by respondent's assertion of an increased deficiency as to 1982. Although an effect of the parties' stipulations is to reduce the 1982 deficiency below the amount in the notice of deficiency, our comparison of the notice of deficiency with *369 the amendment to answer and the parties' stipulations does not enable us to determine whether any "new matter" remains in dispute, as to which respondent would have the burden of proof. See, e.g., Achiro v. Commissioner, 77 T.C. 881, 890 (1981). Petitioner ventured into private practice in late 1981. The parties have stipulated that petitioner's excess withdrawals from the Partnership amounted to $ 2,961.79 in 1982 and $ 26,627.20 in 1983. We think it is likely that petitioner redeemed one or more U.S. savings bonds and received some help from his father in 1982, before he began to resort to self-help by excess withdrawals from the Partnership. Doing the best we can with an inadequate record, we conclude that $ 3,000 of the bank deposit amounts in dispute in the instant issue for 1982 came from nontaxable sources and the remainder from taxable sources. We conclude that petitioner has failed to show that any of the 1983 amounts came from nontaxable sources. We hold in part for petitioner as to 1982; we hold for respondent as to the remaining 1982 amount and all of the 1983 amount on this issue. IV. Additions to Tax: Increased Interest Rate
*370 A. Sec. 6651(a)(1) -- 1982-1984
Petitioner concedes that he failed to timely file his income tax returns for 1982, 1983, and 1984, and that "there is no legitimate excuse for the late filing" of his 1982 tax return. He claims that his 1983 and 1984 tax returns were delayed because "he was waiting for a determination of the tax treatment of Green Sonata". Respondent maintains that petitioner has not presented any reasonable explanation for the late filings. We agree with respondent. Section 6651(a)(1)[16] imposes an addition to tax of 5 percent per month in case of a failure to file a timely tax return, unless it is shown that that failure is due to reasonable cause and not due to willful neglect. Petitioner has the burden of proving error in respondent's determination that such an addition to tax should be imposed against him. Funk v. Commissioner, 687 F.2d 264, 266 (8th Cir. 1982), affg. T.C. Memo. 1981-506; Ehrlich v. Commissioner, 31 T.C. 536, 540 (1958). *371 A taxpayer's grievance with respondent over his or her tax liability for a particular year is not a justifiable reason for the taxpayer's failing to comply with the law requiring the filing of returns for different years. Knollwood Memorial Gardens v. Commissioner, 46 T.C. 764, 796 (1966); Glowinski v. Commissioner, 25 T.C. 934, 936 (1956), affd. 243 F.2d 635 (D.C. Cir. 1957). We conclude that petitioner is liable for additions to tax pursuant to section 6651(a)(1) for each of those years. Petitioner has not suggested that such a liability, if imposed, should be less than the maximum 25 percent; we conclude that petitioner is liable for the maximum 25-percent addition. We hold for respondent on this issue. B. Sec, 6653(a) -- 1981-1984 Respondent claims that petitioner is liable for the negligence, etc., additions to tax for each of the years in issue because (1) petitioner's purchase of Green Sonata in 1981 was "illusory"; (2) petitioner negligently failed to report income from the Partnership and other sources for 1982 and 1983; and (3) petitioner's negligence as to Green Sonata, the *372 Partnership, and other bank deposits caused petitioner to erroneously claim net operating loss and charitable contribution carryover deductions for 1983 and 1984. Petitioner claims that he is not liable for this addition to tax because (1) he "had a good faith belief -- and still does -- that the carefully-crafted transaction relating to "Green Sonata' conformed to the I.R.C. and the Service's interpretation of the Code"; [17] (2) he has a similar good faith belief about his tax treatment of the excess withdrawals from the Partnership; and (3) he contends that the "carryovers were mandated by law and petitioner should not be penalized for complying with the appropriate regulations." We agree with respondent. Section 6653(a)(i)[18] imposes *373 an addition to tax of 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an additional addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to the negligence, etc. Petitioner has the burden of proving error in respondent's determination that these additions to tax should be imposed against him. Bixby v. Commissioner, 58 T.C. 757-792 (1972). *374 Broadly speaking, for purposes of this provision, negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioner is a lawyer. He was certain that respondent would investigate his investment in Green Sonata. He testified that he knew he needed to be able to produce an agreement and to defend his claimed value. Nevertheless, (1) petitioner did not consult a tax adviser, (2) petitioner did not secure a document signed by Davis evidencing a 1981 sale, (3) although petitioner apparently partially performed his agreement to purchase by tendering a $ 1,000 check, he and Davis quickly agreed that the check would not be cashed, (4) petitioner was surprised when a replacement check was cashed in 1984, almost 3 years after his purported purchase, (5) petitioner failed to perform any of his other obligations under the agreement to purchase, even after obtaining possession of Green Sonata, and (6) petitioner thought so little of his obligations under the recourse note that he failed to include it in Davis' estate's estate tax return *375 that petitioner signed as executor. Petitioner was not a naif overawed by a persuasive promoter with impressive credentials; he created the arrangement himself. Petitioner's improper claims resulted in an underpayment for 1981. We conclude that petitioner's careless handling of the transaction shows a lack of due care which an ordinarily prudent person would have used under the circumstances. Similarly, we have already concluded that the amounts petitioner withdrew from the Partnership in 1982 and 1983 were income to him. This conclusion has resulted in underpayments for 1982 and 1983. Petitioner should have known that "borrowing" money from the Partnership without telling the other partners or without being able to provide any documentation of the "loan" was certain to damage his characterization of the excess withdrawals as nontaxable. Petitioner presented little other than his "good faith belief" for his actions in this regard. We conclude that petitioner's tax treatment of the excess withdrawals shows a lack of due care which an ordinarily prudent person would have used under the circumstances. For 1984, respondent's determination of the underpayment (the base for the *376 negligence additions, see sec. 6653(c)(1)) results from the following factors: (1) Disallowance of a claimed $ 4,512 charitable contribution deduction carryover, (2) disallowance of a claimed $ 19,410 net operating loss carryover, (3) imposition of $ 4,271 in self-employment taxes, (4) disallowance of a claimed $ 782.53 investment credit carryover (see supra, note 1 to table 6), (5) a recalculation of the effect of income averaging, and (6) petitioner's failure to file his 1984 tax return on time. Petitioner disputes only the imposition of the 1984 negligence additions on the portion of the underpayment resulting from disallowing the carryover deductions. Neither side has cited authorities dealing with t#e problem of the impact of carryovers on negligence additions. We note that the problem was briefly adverted to, but not squarely decided, in Pappas v. Commissioner, 78 T.C. 1078, 1092-1093 (1982). The charitable contribution deduction carryover is disallowed for 1984 in the notice of deficiency solely because respondent allows deductions for the carried-over amounts in determining deficiencies for the years in which the contributions were made *377 ($ 2,882 for 1982, $ 1,270 for 1983). Thus, petitioner was not negligent, and was not intentionally disregarding rules or regulations, in claiming the deductions on his 1982 and 1983 tax returns. However; petitioner's negligent omissions from income for 1982 and 1983 produced the negative numbers that petitioner reported on his tax returns as his 1982 and 1983 adjusted gross incomes. That led to petitioner's understatement of his "contribution base" (sec. 170(b)(1)(E), later redesignated sec. 170(b)(1)(F)) for each of these years as zero. That led to petitioner's overstatement of his charitable contribution deduction carryovers on his 1984 tax return. Sec. 170(d)(1). Thus, that portion.of the 1984 underpayment that results from the disallowance of the 1984 charitable contribution deduction carryovers to 1984 directly results from petitioner's 1982 and 1983 negligent omissions from income; in the words of section 6653(a)(1) it is "due to negligence" of petitioner. Petitioner states on answering brief that "carryovers were mandated by law and petitioner should not be penalized for complying with the appropriate regulations." This is no different from saying that petitioner's *378 calculations of taxable income for 1982 and 1983 were mandated by law, and so petitioner should not be liable for negligence, etc., additions to tax for 1982 and 1983. They were mandated by law only if the correct amounts were reported for petitioner's adjusted gross incomes. The adjusted gross incomes are erroneous because of petitioner's negligence, and this taint of negligence carries through to those matters that flow from the negligently erroneous 1982 and 1983 adjusted gross incomes. We gee no basis in the statute for distinguishing between a deficiency that results from negligence for the one year and the deficiency that results from the same negligence but, because of computational rules, shows up in the tax liability for another year. As a policy matter, we note that the approach we adopt permits each of petitioner's legitimate charitable contribution deductions to reduce the base (i.e., the underpayment) for the negligence additions to tax for one year. On the other hand, the approach that petitioner urges would allow these deductions to be "double-counted" in calculating the aggregate of the bases for the negligence additions to tax. The same analysis applies to petitioner's *379 net operating loss carryovers to 1984, with the same result. Petitioner does not challenge the 1984 negligence additions with respect to the four other components of the 1984 underpayment. See Emmons v. Commissioner, 92 T.C. 342, 342-351 (1989), affd. 898 F.2d. 50 (5th Cir. 1990), as to the effect of the late filing of petitioner's tax return. We hold for respondent on this issue. C. Sec. 6659 -- 1981
Respondent claims that petitioner is liable for the valuation overstatement addition to tax under section 6659(a)[19] for 1981 because petitioner did not own Green Sonata in that year and therefore had no basis in it. Petitioner claims that he has established his basis in Green Sonata. It is not clear whether petitioner's contention applies only to the basic 1981 deficiency dispute or also to the section 6659 addition to tax. In any event, our conclusion that petitioner did not buy Green Sonata in 1981 is dispositive of this issue because it follows from that conclusion that, within-the meaning of section 6659(c)(1), petitioner's "correct" adjuxted basis in Green Sonata is zero. Zirker v. Commissioner, 87 T.C. 970l 978 (1986). *380 Petitioner claimed a $ 76,062 basis for Green Sonata on his 1981 tax return. Thus, there is a valuation overstatement; because the valuation overstatement is more than 250 percent, the applicable percentage is 30 percent. Sec. 6659(b). *381 We hold for respondent on this issue. D. Sec. 6661 -- 1983
Respondent claims that petitioner is liable for the addition to tax for substantial understatement of income tax for 1983. Petitioner claims that "At the time the 1983 return was filed in 1986, petitioner had already restored the amounts withdrawn without authorization in 1982 and 1983". We agree with respondent. Section 6661[20] imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). *382 For 1983, respondent's determination of the understatement (the basis for the addition to tax under section 6661) results from the following factors: (1) Understatement of petitioner's chapter 1 tax liability, which results from (a) petitioner's excess withdrawals from the Partnership ($ 26,627.20); (b) petitioner's unexplained deposits to his personal accounts ($ 6,143.11); and (c) petitioner's disallowed net operating loss carryover from 1982 ($ 5,731); and (2) understatement of petitioner's chapter 2 (self-employment) tax liability ($ 3,338). See sec. 1.6661-2(d), Income Tax Regs.
Petitioner disputes the application of the section 6661 addition to tax only with respect to that part of the understatement of tax attributable to his omitting from income the 1983 excess withdrawals from the Partnership. Petitioner does not contend that he had substantial authority for his failure to report his additional income for 1983 nor does he contend that respondent abused her discretion in not waiving the section 6661 addition. Petitioner apparently contends he had already disclosed the withdrawals from the Partnership for 1983 on his 1984 tax return (filed after his 1983 tax return) and *383 the Partnership's 1984 returns (dated before his 1983 tax return was filed). See sec. 6661(b)(2)(B)(ii). Petitioner cannot prevail with this contention. Section 6661(b)(2)(B)(ii) specifically provides that the base for the addition to tax is reduced by that portion of the understatement of income tax which is attributable to an item if the relevant facts are adequately disclosed either in a statement attached to the tax return, or on the tax return itself. Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); Antonides v. Commissioner, 91 T.C. 686, 701 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Adequate disclosure can be accomplished under section 6661 by providing on the tax return sufficient information to enable respondent to identify the potential controversy involved. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Petitioner did not attach a statement to his 1983 tax return disclosing the relevant facts, or explaining his position regarding his excess withdrawals from the Partnership, *384 or enabling respondent to identify a potential dispute as to excess withdrawals. Nor does petitioner's 1983 tax return itself provide any such disclosure. Whatever may be the legal significance of disclosures on other tax returns (e.g., petitioner's tax returns for 1982 and 1984, and the Partnership's tax returns for 1982, 1983, and 1984), none of the tax returns in evidence discloses the relevant facts, or explains petitioner's position, or enables respondent to identify the potential dispute that we deal with. We hold for respondent on this issue. E. Sec. 6621(c) -- 1981
Respondent claims that petitioner's deficiency for 1981 is a substantial underpayment attributable to a tax motivated transaction, specifically a valuation overstatement. As a result, respondent claims; petitioner is liable for increased interest under section 6621(c). Petitioner claims that the transaction was not motivated by tax considerations. We agree with respondent. Section 6621 (c)[21] provides that, if a substantial underpayment is attributable to a tax motivated transaction, then the interest rate on that underpayment is 120 percent of the regular underpayment interest rate. *385 The additional interest accrues after December 31, 1984, even though the disputed deficiency is for a year before the enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The provision specifies what categories of transactions are tax motivated transactions. One such category (sec. 6621(c)(3)(A)(i)) is a valuation overstatement, within the meaning of section 6659(c). The depreciation deduction and investment credit that petitioner took result from his claim of a $ 76,062 basis for Green Sonata. We have already determined that petitioner did not buy Green Sonata in 1981 and therefore his correct basis is zero. It follows that there is a valuation overstatement within the meaning of section 6659(c). It follows that petitioner has an underpayment attributable to a tax motivated transaction. It clearly appears that the amount of the underpayment so attributable exceeds $ 1,000. The entire underpayment for 1981 results from the disallowed depreciation deduction and investment credit. Petitioner is therefore liable for the *386 additional rate of interest under section 6621(c) on the entire underpayment for 1981. We hold for respondent on this issue. To take account of the foregoing, and respondent's concessions, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section, chapter, and subtitle references are to sections, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue; references to section 6621↩ are to that section of the Internal Revenue Codes of 1954 and 1986 as in effect for periods after December 31, 1984.
1. Of these amounts, the following are self-employment taxes under ch. 2: 1982 -- $ 913, 1983 -- $ 3,338, 1984 -- $ 4,271; the remaining amounts are ch. 1 income tax.↩
2. 50 percent of the interest due on the entire deficiency for each year.↩
2. The medical expense deduction adjustments for 1982 and 1983 depend on the parties' concessions and our resolution of certain disputed items; they are computational only. Although petitioner disputes the correctness of many of the adjustments that affect his income, he does not contend that even if we were to uphold the adjustments, he is not liable for the self-employment taxes. We conclude that the self-employment taxes are computational only. Respondent's disallowances of petitioner's net operating loss carryover deduction for 1983 and 1984 and petitioner's carryover charitable contribution deduction for 1984 depend on the parties' concessions and our resolution of certain disputed items; they are computational only.↩
3. Rule 151(e)(3) provides, in pertinent part, as follows: RULE 151. BRIEFS * * * (e) Form and Content: All briefs shall contain the following in the order indicated: * * * (3) * * * In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact. In the instant case, the parties filed simultaneous briefs. Petitioner's answering brief does not include responses to respondent's proposed findings of fact. Under the circumstances, we have assumed that petitioner does not object to respondent's proposed findings of fact except to the extent that petitioner's proposed findings of fact are clearly inconsistent therewith. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The Green Sonata lithograph package (hereinafter sometimes referred to as Green Sonata) appears to have included ownership of a thing or things from which lithographic reproductions could be made and about 200 to 250 signed and numbered lithographs. It is unclear what marketing and reproduction rights were included in this package.↩
5. The term "print" means a lithograph or other impression from a plate created by Davis or under his supervision and control.↩
6. The term "H.C." means "hors commerce" and includes prints made for copyright purposes.↩
7. The term "master" refers to a lithographic plate from which prints or reproductions of the print can be made.↩
1. Petitioner's 1983 tax return shows a tentative investment credit of $ 782.53, but no allowed credit because of the tax liability limitation. Sec. 46(a)(3). The credit is shown on the tax return in connection with petitioner's trade or business of being a lawyer. The credit is claimed as a carryover on petitioner's 1984 tax return. The notice of deficiency does not allow an investment credit for 1983 and also does not allow an investment credit for 1984, and does not explain this position. At the same time, the notice of deficiency does not disturb petitioner's claimed depreciation deduction for what appears to be the same 1983 acquisition that gave rise to the tentative investment credit. The parties are to clarify this matter in their computation under Rule 155.↩
8. Sec. 162(a) provides, in pertinent part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩
9. Sec. 167(a) provides, in pertinent part, as follows: SEC. 167. DEPRECIATION. (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wearand tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income.↩
10. SEC. 167. DEPRECIATION. (g) Basis for Depreciation. -- The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. As a result of sec. 11812(a)(1) of the Omnibus Budget Reconciliation Act of 1990 (Pub. L. 101-508, 104 Stat. 1388, 1388-534) and sec. 13261(b)(2) of the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66, 107 Stat. 312, 538), this provision is now designated as sec. 167(c)(1).↩
11. Sec. 48(a)(1) provides, in pertinent part, as follows: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. -- (1) In general. -- Except as provided in this -subsection, the term "section 38 property" means -- (A) tangible personal property * * * Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * * The investment credit was generally repealed for property placed in service after Dec. 31, 1985, by sec. 211(a) of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, 2166.↩
12. 12 Sec. 61(a) provides, in pertinent part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition. --Except as otherwise provided in this subtitle [subtitle A, relating to income taxes], gross income means all income from whatever source derived, included (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; (2) Gross income derived from business; The later amendment of this provision by sec. 531(c) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 884, does not affect the instant case.↩
13. The parties have stipulated that petitioner prepared the Partnership 1983 tax return. The Schedule K-1 for petitioner attached to the Partnership's 1983 tax return shows that petitioner's interest in the Partnership increased from 33-1/3 percent to 40 percent in 1983. Yet, (1) on brief petitioner indicates that each partner had a one-third share in the Partnership at the end of each year, and (2) the Partnership's 1983 tax return states that there was not any transfer of an interest in the Partnership in 1983. The parties do not deal with this apparent conflict or what is the correct amount of petitioner's distributive share of the Partnership's 1983 ordinary income. Nor have the parties dealt with whether the Partnership's understatement of its 1983 income by $ 15,264 should be treated under sec. 702.↩
14. Petitioner also directs our attention to Ocean Sands Holding Corp. v. Commissioner, T.C. Memo. 1980-423. In Ocean Sands, two shareholders of a corporation withdrew about $ 500,000 from the corporation's safes, and deposited the money into joint savings accounts under their names. A week later, they began withdrawing the money and returned it to the corporation. Most of the money was returned during the same taxable year; the remainder was returned the next year. The Court focused on the shareholders' prompt steps to begin restoring the money, the restoration of most of the money within the same year, and the shareholders' recognition of their obligation to repay the remainder. In the instant case, petitioner did not make any repayments in the years he made the withdrawals, nor did he acknowledge to the Partnership either the withdrawals or his obligation to repay them. Ocean Sands↩ is distinguishable.
15. Sec. 1341(a) provides, in pertinent part, as follows: SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT. (a) General Rule. --If-- (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item; (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and (3) the amount of such deduction exceeds $ 3,000, then the tax imposed by this chapter [ch. 1, relating to income] for the taxable year shall be the lesser of the following: (4) the tax for the taxable year computed with such deduction; or (5) an amount equal to-- (A) the tax for the taxable year computed without such deduction, minus (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).↩
16. Sec. 6651(a)(1) provides, in pertinent part, as follows: SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax. -- In case of failure -- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩
17. "As pointed out in White v. Arlen Realty and Dev. Corp., 614 F.2d * * * [387,] 388, [4th Cir. 1980], the first casualty of a lawyer representing himself/herself is objectivity." Aronson v. U.S. Land Urban Dev., 866 F.2d 1, 6↩ (1st. Cir. 1989).
18. Sec. 6653(a) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), * * * The later amendments of this provision by sec. 1503 of TRA 86, 100 Stat. at 2742, and by sec. 1015(b)(2)(A) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), do not affect the instant case. As a result of secs. 7721(a) and 7721(c)(1) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2395, 2399, the revised negligence, etc., addition to tax now appears in subsecs. (b)(1) and (c) of sec. 6662, I.R.C. 1986↩.
19. Sec. 6659 provides, in pertinent port, as follows: SEC. 6659 ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX. (a) Addition to the Tax. -- If -- (1) an individual, * * * has an underpayment of the tax imposed by chapter 1 for the taxable year which in attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. * * * * (c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). This text includes the amendment made by sec. 107(a)(2) of the Technical Corrections Act of 1982, Pub. L. 97-448, 96 Stat. 2365, 2391, which was made retroactive by sec. 109 of that Act. The later amendment of this provision by sec. 155(c)(1)(A) of DEFRA 84, 98 Stat. at 693, does not apply to the instant case. As result of sec. 7721(c)(2) of OBRA 89, the revised valuation overstatement addition to tax now appears in subsecs. (b)(3), (e), and (h) of sec. 6662, I.R.C. 1986↩.
20. Sec. 6661 provides, in pertinent part, as follows: SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY. (a) Addition to Tax. -- If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. (b) Definition and Special Rule. -- (1) Substantial understatement. -- (A) In general. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000. * * * * (2) Understatement. -- * * * * (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. * * * * (c) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer-that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith. This text takes into account an amendment made by sec. 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951. As a result of sec. 7721(c)(2) of OBRA 89, the substance of former sec. 6661 now appears as sec. 6662(d), I.R.C. 1986↩.
21. Sec. 6621 provides, in pertinent part, as follows: SEC. 6621. DETERMINATION OF RATE OF INTEREST. * * * * (c) Interest on Substantial to Tax Motivated Transactions. -- (1) In general. -- In the under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section. (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the-term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), This text takes into account amendments made by sec. 1511(c)(1) of TRA 86, 100 Stat. at 2744. Sec. 6621(c)↩ was repealed by sec. 7721(b) of OBRA 89. The repeal applies to tax returns due after Dec. 31, 1989 (sec. 7721(d) of the Act, 103 Stat. at 2400), and so does not affect the instant case.